# United States Court of Appeals
## For the First Circuit

---

No. 98-1974

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM G. AGNE, D/B/A PUMP SALES AND SERVICES,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Hector M. Laffitte, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Guillermo J. Ramos-Luina for appellant.
Desiree Laborde-Sanfiorenzo, Assistant U.S. Attorney, with whom Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco, Assistant U.S. Attorney, and Camille Velez-Rive, Assistant U.S. Attorney, were on brief for appellee.

---

May 31, 2000

---

**COFFIN, Senior Circuit Judge.** Defendant William G. Agne seeks reversal of his criminal convictions for wire fraud, bank fraud, and making a false statement on a loan or credit application ("false statement"). Defendant's contentions are that the wire fraud charge was barred by a statute of limitations, that a letter of credit is not a document encompassed within the false statement statute, that there was insufficient evidence that he committed a scheme to defraud, and that the court made evidentiary and sentencing errors. Concluding as a matter of law that defendant's actions did not "affect" a financial institution, we vacate his conviction for wire fraud. We reject defendant's other contentions and affirm his convictions for bank fraud and false statement.

## I.  Facts

The jury would have been warranted in finding the following facts.  In May 1991, R.G. Engineering, Inc. (R.G.), a Puerto Rico corporation, issued a purchase order for $438,750 to Pump Sales and Service, Inc., a New Jersey corporation of which defendant was president and owner, for a series of replacement parts for an industrial circulating water pump.  Pump Sales supplied various parts to R.G., although the relationship between the parties deteriorated due to disputes about shipping, billing, and other matters.  Defendant and Roberto Camino,

-3-

president of R.G., ceased speaking to each other in the spring of 1992. Communication on behalf of Pump Sales was then conducted almost exclusively by Romie Ausman, an employee of Intesco, a Florida affiliate of Pump Sales owned by defendant.

In November 1991, R.G. advanced Pump Sales $75,000 to start the fabrication process for the final parts – two "impellers" and two "suction bells" – including drawings, patterns, casting, machining, and balancing. A March 1992 letter from Pump Sales represented that it had utilized the advance to take steps toward the manufacture of the parts. Although the drawings were made, the process apparently never advanced beyond that stage.

R.G. opened an irrevocable letter of credit in the amount of $109,411 in favor of Pump Sales at Banco Santander Puerto Rico in May 1992. An officer of Banco Santander testified that a letter of credit "is an instrument issued by a bank acting on its customer's instructions whereby the bank engages with a beneficiary, which usually is the seller in a transaction, to pay against certain documents which are stipulated in the letter of credit." The letter of credit was intended to facilitate payment for the impellers and suction bells and was to be drawn on by Pump Sales after it had initiated the delivery of those parts. The letter of credit

authorized the bank to pay Pump Sales the full amount upon its presentation of a sight draft (essentially a demand for payment), a commercial invoice for "pump parts," a packing list, and the original trucker's bill of lading.

In mid-June 1992, defendant phoned Banco Santander several times to inform it that Pump Sales was sending documentation via courier that would allow it to collect the funds authorized by the letter of credit. On June 18, Pump Sales presented the bank with a sight draft endorsed by defendant, a commercial invoice representing that pump parts were shipped on that date, a packing list, and a bill of lading. The bill of lading contained a discrepancy, and the bank informed defendant that it would not issue the funds. In a letter dated June 24, Pump Sales enclosed a corrected bill of lading.

After reviewing Pump Sales's documentation, the bank on June 26 transferred by wire $109,411 to Pump Sales's account at a New Jersey bank. On July 3, the bank debited R.G.'s corporate account $109,411. Camino, R.G.'s president, was surprised that the impellers and suction bells were ready so soon and as a result he visited his freight forwarder in New Jersey to determine what parts had been shipped. He discovered that four previously paid for shafts had been shipped, but not the suction

bells or impellers. R.G. never received the impellers and suction bells.

Defendant was charged with bank fraud in violation of 18 U.S.C. § 1344, making a materially false statement or report for the purpose of influencing the action of a federally insured institution in violation of 18 U.S.C. § 1014, and wire fraud in violation of 18 U.S.C. § 1343. He was convicted by a jury on all three counts.

II. <u>Whether the Charge of Wire Fraud was Time-Barred</u>

Defendant committed the actions that led to his convictions between March 1991 and June 1992. The government indicted him for wire fraud in January 1998. Defendant contends that the charge was time-barred.

The statute of limitations in 18 U.S.C. § 3282 requires that wire fraud charges be brought within five years of the offense. Section 3282 is modified, however, by 18 U.S.C. § 3293(2), which establishes a ten year statute of limitations when the "offense affects a financial institution." Defendant argues that the bank suffered no loss and was not affected by his actions, and that therefore the five year statute of limitations applied and the indictment was tardy. The district court summarily presumed that the bank experienced a risk of loss and that was sufficient to support the charge. We review this issue of law, one of

-6-

first impression in this circuit, de novo.  See United States v.

Rivera, 131 F.3d 222, 224 (1st Cir. 1997) (interpretation of

statute is purely legal question reviewed de novo).

Our first reference point is the statutory language.  See

Greebel v. FTP Software, Inc., 194 F.3d 185, 192 (1st Cir.

1999); see also Rivera, 131 F.3d at 224 ("When the 'plain

meaning' is clear on its face, 'the sole function of the courts

is to enforce it according to its terms.'" (citation omitted)).

No definition of "affect" is found in the statute.  Its

dictionary definition is "to act on; produce an effect or change

in."  The Random House Dictionary of the English Language 33 (2d

ed. 1983).  Its synonyms are listed as "influence, sway; modify,

alter," id., lending support to defendant's position that there

must be some negative consequence to the financial institution

to invoke the extended statute of limitations.

The little precedent that exists leans in the same

direction.  The two courts that have had occasion to interpret

section 3293(2) considered situations in which the financial

institution was a parent to the defrauded entity and thus was

closely financially linked to it.  In United States v. Pelullo,

964 F.2d 193 (3d Cir. 1992), the Third Circuit rejected the

argument that the parent financial institution of a wholly owned

subsidiary could not be affected when the fraud was directed at

-7-

the subsidiary, noting that Congress intended to extend the statute to wire fraud that did not necessarily target a financial institution but nonetheless affected it. See id. at 214-16. In United States v. Bouyea, 152 F.3d 192 (2d Cir. 1998), the Second Circuit, confronting a situation where a wholly owned subsidiary suffered a loss of $150,000 after borrowing money from its parent financial institution to finance its transaction with the defendant, held that the evidence was sufficient to allow the jury to find that the defendant's actions affected a financial institution. See id. at 195.

In both cases, the financial institution presumably suffered a loss or at the very least was exposed to a high risk of loss as a result of defendant's commission of fraud resulting in a loss to its subordinate entity. The court in Pelullo recognized that there was, however, a limit to the statute's reach, noting that the effect on the bank would be too attenuated to invoke the statute in certain circumstances, for example, "if the fraud was directed against a customer of the depository institution which was then prejudiced in its dealings with the institution." Pelullo, 964 F.2d at 216. We agree that at minimum there needs to be some impact on the financial institution to support a conviction.

We conclude that this is a case in which the consequence to the bank, if any, is too remote to sustain the conviction. Even assuming, without deciding, that being exposed to a risk of loss is sufficient to "affect" a bank, within the ordinary meaning of that term, we cannot agree with the district court that this defendant created such a risk.

In Banco Santander's standard application and agreement for an irrevocable letter of credit, R.G. promised to pay the bank on demand for each draft drawn under the credit by Pump Sales. Camino agreed that pursuant to the bank's typical procedure, "the letter of credit was set up [such] that R.G. Engineering, Inc., was going to be debited from R.G. Engineering's account in Banco Santander immediately upon payment of the letter of credit." In fact, R.G.'s corporate account at Banco Santander was debited the full amount of the letter of credit shortly after the payment was made to Pump Sales.[1] The bank officer testified that R.G. usually maintained ample funds to cover its needs and that there were sufficient funds in R.G.'s commercial

---

[1] It could be, but was not, argued that R.G. could theoretically have withdrawn the entirety of its funds on deposit with the bank in the brief interim between the bank's issuance of funds to Pump Sales and its debiting of R.G.'s account. Given the facts of this case, however, the likelihood of this occurrence is too minimal to justify criminal liability.

account at the time that the letter of credit was drawn for the bank to debit R.G.'s account.

Further, R.G. pledged as security for the letter of credit all of its assets in the possession of the bank.[2]  The bank officer testified that the letter of credit was established such that, first, the bank would debit R.G.'s account after issuing the letter of credit, and if sufficient funds were not available in R.G.'s account, then R.G. would draw a commercial loan for the amount.  Thus, the bank was protected by R.G.'s promise to compensate it for funds issued to Pump Sales.

The government suggests that the bank was subject to a potential loss in that R.G. could have instituted a civil suit against it for wrongfully honoring the letter of credit.  The

---

[2]The letter of credit stated that R.G. agreed:

To pledge . . . to you as security for any and all of the obligations and/or liabilities of the undersigned hereinbefore or hereinafter referred to, now or hereafter existing, any and all property of the undersigned now or at any time(s) hereafter in your possession or control or that of any third party acting in your behalf, whether for the express purpose of being used by you as collateral security or for safekeeping or for any other or different purpose . . . . and the undersigned hereby authorize(s) you, at your option at any time(s), whether or not the property then held by you as security hereunder is deemed by you to be adequate, to appropriate and apply upon any and all of the said obligations and/or liabilities, whether or not then due, any and all moneys now or hereafter with you on deposit or otherwise to [the] credit of or belonging to the undersigned . . . .

letter of credit, however, protects the bank from this possibility as well: "[N]either you [Banco Santander] nor any of your correspondents shall be responsible for . . . the validity, sufficiency or genuineness of documents, or of any endorsement(s) thereon, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged . . . ."

Finally, the government suggested at oral argument, in an argument likely waived, that the bank was at risk of losing its client, R.G., as well as tarnishing its reputation. We cannot construe a criminal statute to sweep so broadly as to make one guilty of wire fraud for merely arousing these possibilities.

Our conclusion here does not mean that a bank could never be "affected" by the use of fraudulent documents to draw the funds of another. In this case, however, we cannot say that defendant's actions "affected" a financial institution within the plain meaning of that term because the bank suffered no actual financial loss and experienced no realistic prospect of loss because of the continuing adequacy of funds in R.G.'s corporate account and the protective terms of the letter of credit.

III. <u>Sufficiency of Evidence of Scheme to Defraud</u>

Bank fraud is defined by 18 U.S.C. § 1344 as "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice -- (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." Defendant moved for a judgment of acquittal on the charge of bank fraud on the basis that the government failed to establish the element of "scheme to defraud." Defendant alleges that he did ship shafts, which qualify as "pump parts," shortly after he drew upon the letter of credit and that he was unaware that the letter of credit was established as remuneration specifically for the final impellers and suction bells. He suggests that the documentation he submitted to the bank was not fraudulent on its face. We review the denial of a motion for acquittal by assessing the evidence as a whole in the light most favorable to the verdict. See United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998).

We have defined "scheme" in the context of bank fraud to include "any plan, pattern or course of action, including false and fraudulent pretenses and misrepresentations intended to deceive others in order to obtain something of value." United

-12-

States v. Blasini-Lluberas, 169 F.3d 57, 65 (1st Cir. 1999) (internal quotation marks and citations omitted). "'The term 'scheme to defraud,' however, is not capable of precise definition. Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community.'" United States v. Brandon, 17 F.3d 409, 424 (1st Cir. 1994) (quoting United States v. Goldblatt, 813 F.2d 619, 623-24 (3d Cir. 1987)).

The government marshaled sufficient evidence to show that defendant engaged in a scheme to defraud. Defendant did not use the $75,000 advance for the impellers and suction bells for its specifically stated purposes. He twice forwarded to the bank documentation to draw on the letter of credit even though he had not shipped the impellers and suction bells for which he was aware that the letter of credit was payment. He phoned Banco Santander on multiple occasions in order to assure that the letter of credit funds were forwarded to his account. Defendant acknowledged, in response to one of several requests for information from R.G., that he had collected on the letter of credit but that the impellers and suction bells were still being manufactured. Thus, the government established that defendant engaged in a deceitful pattern of activity in order to obtain

-13-

money.  This was sufficient to prove a scheme to defraud.  See,
e.g., Blasini-Lluberas, 169 F.3d at 65 (defendant engaged in
scheme to defraud when he deceitfully characterized a
transaction as a loan and misrepresented the purpose of the
loan); Brandon, 17 F.3d at 424 (defendant entered into scheme to
defraud when he fraudulently represented that down payments had
been paid in order to receive loan financing from a bank).

IV.  Whether a Letter of Credit Falls within the Purview
of 18 U.S.C. § 1014

The false statement statute proscribes knowingly making such
a statement in order to influence a financial institution's
action "upon any application, advance, discount, purchase,
purchase agreement, repurchase agreement, commitment, or loan."
18 U.S.C. § 1014.  Defendant argues that because a letter of
credit is not specifically listed in section 1014 his use of
fraudulent documentation to draw on the letter of credit is not
conduct encompassed by the statute.  We review this issue of
law, also one of first impression in this circuit, de novo.  See
Rivera, 131 F.3d at 224.

Although a letter of credit is not specifically listed
within the statute, it is easily defined as a type of
"commitment."  "Commitment" itself may be defined as "a pledge
or promise; obligation."  The Random House Dictionary of the
English Language 412 (2d ed. 1983).  By definition, a letter of

credit is a commitment made by the bank to honor demands for payment from the beneficiary.

Our conclusion is in accord with holdings of the Third and Seventh Circuits that letters of credit fit comfortably within the statute. See United States v. Yung Soo Yoo, 833 F.2d 488, 491 (3d Cir. 1987) (letter of credit is "commitment" by bank); United States v. Tucker, 773 F.2d 136, 139 (7th Cir. 1985) (letter of credit is form of "application," "advance," and "commitment"). Other courts have also upheld convictions under section 1014 when the specific transaction was not named in the statute but was a subcategory of a listed term. See United States v. Bonnette, 781 F.2d 357, 364-66 (4th Cir. 1986) (depositing fraudulent drafts); United States v. Price, 763 F.2d 640, 643 (4th Cir. 1985) (depositing false credit card receipts).

Defendant relies heavily on Williams v. United States, 458 U.S. 279 (1982), in which the Supreme Court explained that section 1014 "reduced 13 existing statutes, which criminalized fraudulent practices directed at a variety of financial and credit institutions, to a single section," but did not alter the types of actions proscribed by the statute. Id. at 288. Defendant argues that letters of credit were not issued by the institutions protected in the precursors to section 1014 and

-15-

therefore the statute should not be construed to include letters of credit. Were we to abide by this sort of rationale, false statements involving new financial instruments would not be covered by the statute. This would be an absurd result, especially here where the financial instrument, a letter of credit, fits easily within at least one category specifically listed in the statute.

V. <u>Admission of Statements under Fed. R. Evid. 801(d)(2)(D)</u>

Defendant argues that the court erred by admitting testimony of conversations between the president of R.G. and Romie Ausman bearing on the terms and purpose of the letter of credit as vicarious admissions of a party-opponent excluded from the definition of hearsay by Fed. R. Evid. 801(d)(2)(D). The rule allows for the admission of a party-opponent's statement if it "is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Defendant contends that the government did not adequately prove that Ausman was his agent rather than merely an employee of an affiliated company. We review the court's decision to admit the evidence over defendant's objection for an abuse of discretion. <u>See</u> <u>Woodman</u> v. <u>Haemonetics Corp.</u>, 51 F.3d 1087, 1094 (1st Cir. 1995).

-16-

Whether the statements of a corporate employee may be admitted against a corporate officer depends upon the relationship between the employee and the officer; "if the factors which normally make up an agency relationship are present, the evidence should not be excluded simply because the statement is offered against a corporate officer, rather than the corporation." United States v. Young, 736 F.2d 565, 568 (10th Cir. 1983) (per curiam) (admitting statements of corporate employee when testimony was given that the defendant was his supervisor), rev'd on other grounds, 470 U.S. 1 (1985). An agency relationship between an employee declarant and a defendant employer may be established by a variety of evidence, such as evidence that the declarant is directly responsible to the defendant, see Zaken v. Boerer, 964 F.2d 1319, 1322-23 (2d Cir. 1992); that the declarant reports directly to the defendant who owns an overwhelming majority of stock in the company, see United States v. Paxson, 861 F.2d 730, 734 (D.C. Cir. 1988); that the declarant was hired by the defendant and worked on matters in which the defendant was actively involved, see United States v. Draiman, 784 F.2d 248, 256-57 (7th Cir. 1986); or that the defendant "directed [the declarant's] work on a continuing basis," Boren v. Sable, 887 F.2d 1032, 1041 (10th Cir. 1989).

We find no error in the district court's decision to admit the testimony because the evidence here is ample to show an agency relationship between Ausman and Agne. Testimony at trial established that Ausman was hired by Agne in 1989 to conduct business for Intesco, owned solely by defendant. Agne was also the president and owner of Pump Sales, which Intesco served as an "international arm."[3] In one communication from Agne to Camino, he reported that while he was away from the office for the following week, Ausman was to handle relations between Pump Sales and R.G. Ausman was present at all meetings between Camino and Agne and he was in conversation with Camino regarding the purchase order, shipment dates, and payment.

After relations between Camino and Agne deteriorated, Ausman was the contact for Pump Sales in its relations with R.G. Ausman represented to Camino that he had been appointed by Agne to negotiate payment terms. Camino was in contact with Ausman every ten or fifteen days while the terms of the letter of credit were being negotiated. When Ausman resigned from Intesco, Agne requested that Camino deal with him directly in

---

[3]Defendant contends that Ausman left the employ of Intesco sometime in May 1992. Because defendant did not supply any record references as to the exact date of this occurrence, we cannot say that the court erred by ruling that Ausman was an agent of defendant's at the time he made the admitted statements.

Ausman's absence.  Thus, the record supports an inference that Ausman was directly responsible to defendant and therefore his statements regarding the letter of credit were admissible against defendant.[4]

## VI. Sentencing

Finally, defendant makes two arguments concerning his fifteen month sentence. First, he contends that the court erred in considering the loss to R.G. as a basis upon which to increase his base offense level under U.S.S.G. § 2F1.1(b)(1)(G). Under section 2F1.1(a), crimes involving fraud and deceit receive a base offense level of six.  The offense level increases in accordance with the amount of loss; losses caused by a defendant's fraud of greater than $70,000 but less than $120,000 result in a six level increase. "Loss" is defined by

---

[4]Defendant also challenges the district court's instructions to the jury regarding the government's burden to prove all the elements of each charge beyond a reasonable doubt.  The court did not provide a specific definition of "reasonable doubt" as requested by defendant.  The court did not err because "no definition of reasonable doubt need be included in jury instructions."  United States v. Olmstead, 832 F.2d 642, 646 (1st Cir. 1987); see also United States v. Rodriguez-Cardona, 924 F.2d 1148, 1160 (1st Cir. 1991).  It is of no import that both defendant and the government requested an instruction defining "reasonable doubt."  See United States v. Cassiere, 4 F.3d 1006, 1024 (1st Cir. 1993) (reiterating that trial court is "in the best position to determine whether, and if so how, to define reasonable doubt").

the guidelines commentary as "the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1 cmt. 7.

Defendant argues that because the government cannot charge him with wire fraud against R.G. due to the five-year statute of limitations, the court should not have considered the loss to R.G. Defendant suggests that the only relevant loss was that of the bank and thus there was no loss. "We review a district court's construction of a sentencing guideline de novo, see United States v. McDonald, 121 F.3d 7, 9 n.1 (1st Cir. 1997), and its application of a sentencing guideline to the facts in the same manner, see United States v. Muniz, 49 F.3d 36, 41 (1st Cir. 1995)." United States v. Nunez, 146 F.3d 36, 40 (1st Cir. 1998).

The guidelines do not specify who must suffer the loss. The guidelines do direct a sentencing court to consider all acts of the defendant as well as "all harm that resulted from the acts" of defendant. See U.S.S.G. § 1B1.3(a)(1)(A) & (3). Here, the court considered the range of defendant's acts and their repercussions, choosing to assign a loss of only $109,411, even though it could have increased this amount by the $75,000 loss to R.G. resulting from Pump Sales's improper use of R.G.'s advance. Moreover, the guidelines do not require that the court specifically identify victims. See United States v.

<u>Resurreccion</u>, 978 F.2d 759, 762 (1st Cir. 1992) ("That there likely are such victims, or that the defendant intends them to exist, is often sufficient to show a likely actual, or intended, loss."). At trial, Camino testified that R.G. never received anything for the $109,411 fraudulently obtained by Pump Sales. Thus, it was not error for the court to conclude that $109,411 was the amount of the loss.

Second, defendant argues that the court erred by giving him a two level enhancement for "more than minimal planning," pursuant to U.S.S.G. § 2F1.1(b)(2)(A). The guidelines commentary explains that "more than minimal planning" means "more planning than is typical for commission of the offense in a simple form." U.S.S.G. § 1B1.1 cmt. 1(f). It also can mean that "significant affirmative steps were taken to conceal the offense . . . . [or] repeated acts [were committed] over a period of time, unless it is clear that each instance was purely opportune." <u>Id.</u> Defendant argues that the letter of credit inadequately described the products to be shipped and that his repeated deceptive acts were merely opportunistic. "We review the district court's minimal planning assessment only for clear error," and "[w]e are not inclined to reverse a finding of more than minimal planning unless the evidence compels the conclusion

that the defendant's actions were purely opportune or 'spur of the moment.'" Brandon, 17 F.3d at 459.

In United States v. Fox, 889 F.2d 357 (lst Cir. 1989), we stated that we could not "conceive of how obtaining even one fraudulent loan would not require more than minimal planning." Id. at 361. We have consistently concluded that repeated actions in furtherance of a crime -- particularly a white-collar crime -- require more than minimal planning. See United States v. Royal, 100 F.3d 1019, 1032 (lst Cir. 1996) ("The sentencing court was entitled to find, under the definition provided by the guidelines, that [defendant's] repeated acts in the course of this conspiracy required more than minimal planning."); United States v. Santiago-Gonzales, 66 F.3d 3, 7 (lst Cir. 1995) (when defendant made seven separate falsified entries, he engaged in more than minimal planning).

The evidence confirms that defendant undertook more than minimal planning. His deceitful actions began with his misuse of the $75,000 advance, included his involvement of other Pump Sales employees to create the fraudulent documentation, and culminated in his repeated efforts to fraudulently induce the bank to issue the monies authorized by the letter of credit. We cannot conclude that defendant's actions were merely opportunistic or "spur of the moment."

-22-

## VII.  Conclusion

We vacate defendant's conviction for wire fraud and remand to the district court to adjust defendant's sentence as appropriate.  We affirm defendant's convictions for bank fraud and making a false statement on a loan or credit application, concluding that a letter of credit falls under the false statement statute, that the evidence was sufficient to establish a scheme to defraud, and that the court did not err in admitting statements of defendant's agent or in sentencing defendant.

Vacated in part and affirmed in part, remanded for further proceedings consistent with this opinion.