In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-1702, 02-1726 & 02-1925

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

JOHN SERPICO and GILBERT CATALDO,

*Defendants-Appellants,*
*Cross-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 570—**Blanche M. Manning**, *Judge.*

ARGUED OCTOBER 31, 2002—DECIDED FEBRUARY 20, 2003

Before RIPPLE, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* For 12 years, John Serpico and Maria Busillo held and abused various influential positions with the Central States Joint Board ("CSJB"), a labor organization that provides support to its member unions. Among other responsibilities, Serpico and Busillo controlled the management of the unions' money. The pair, along with longtime friend and business associate Gilbert "Bud" Cataldo, collaborated on three schemes involving the misappropriation of the unions' funds. Two of those

schemes are the focus of this appeal by Serpico and Cataldo (Busillo has not appealed her conviction).

In their "loans-for-deposits" scheme, Serpico and Busillo deposited large sums of union money in various banks. In exchange, the two received overly generous terms and conditions on personal loans totaling more than $5 million. In the more complicated hotel loan kickback scheme, several groups entered into the 51 Associates Limited Partnership, which planned to construct a hotel. The partnership was unable to obtain financing for the construction of the building without first securing a commitment for a mortgage loan that would guarantee repayment of the construction loan after the hotel was built. Serpico used union funds to make a mortgage loan to the developers, after which Mid-City Bank agreed to make the construction loan. In exchange for Serpico's help in securing the loan, 51 Associates paid $333,850 to Cataldo's corporation, Taylor West & Company, for "consulting services" that Cataldo never actually performed. Cataldo then kicked back $25,000 to Serpico by paying Serpico's share of a $50,000 investment into an unrelated business project (the Studio Network project) in which the two were partners.

Serpico, Busillo, and Cataldo were tried on charges of racketeering, mail fraud, and bank fraud. At the close of the evidence, the court granted motions by Serpico and Busillo for acquittal on the racketeering and bank fraud counts. The jury convicted Serpico and Busillo on mail fraud charges relating to the loans-for-deposits scheme and Serpico and Cataldo on mail fraud charges for the hotel loan kickback scheme.

At sentencing, the district court determined that Serpico and Cataldo were each responsible for a loss of $333,850, the amount paid to Cataldo, for the hotel loan kickback scheme. For the loans-for-deposits scheme, the court

found the damage to the unions to be equal to the additional amount of interest the union assets would have earned had Serpico purchased CDs at banks offering the highest interest rates instead of those offering him special deals on his personal loans. The court totaled loans from Capitol Bank as well as six others, estimating the loss to be between $30,000 and $70,000. The court thus increased Serpico's base offense level of 6 by 9 levels, plus 2 levels for more than minimal planning and 2 levels for abuse of trust (19 total). Serpico and Cataldo were sentenced to 30 and 21 months in prison, respectively.

Serpico and Cataldo (collectively "Serpico" as we go forward) appeal, challenging the verdicts and the application of the sentencing guidelines on a number of grounds. In its cross-appeal, the government also contests the application of the sentencing guidelines.

First, Serpico argues that his convictions should be overturned because his schemes did not "affect" a financial institution. The 5-year statute of limitations for mail and wire fraud offenses under 18 U.S.C. § 3282 is extended to 10 years "if the offense affects a financial institution," 18 U.S.C. § 3293(2), and Serpico could not have been prosecuted without that extension. Serpico claims that an offense only "affects a financial institution" if the offense has a direct negative impact on the institution. The district court instructed the jury that the schemes affected the banks if they "exposed the financial institution[s] to a new or increased risk of loss. A financial institution need not have actually suffered a loss in order to have been affected by the scheme."

Although Serpico agreed to the jury instruction, he now points to *United States v. Agne*, 214 F.3d 47, 53 (1st Cir. 2000) and *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000), to support his claim that the financial institution must suffer an actual loss. In *Agne*, however, the

court found that the bank "experienced no realistic prospect of loss," so it did not have to reach the question of whether the bank must suffer an actual loss. *Agne*, 214 F.3d at 53. Similarly, *Ubakanma* simply held that "a wire fraud offense under section 1343 'affected' a financial institution only if the institution itself were victimized by the fraud, as opposed to the scheme's mere utilization of the financial institution in the transfer of funds." *Ubakanma*, 215 F.3d at 426. Neither side here argues that "mere utilization" is sufficient; the question is whether an increased risk of loss is enough, even if the institution never suffers an actual loss.

Several courts, including this one and the Fourth Circuit, which produced *Ubakanma*, have concluded that an increased risk of loss is sufficient in similar contexts. *See*, *e.g.*, *United States v. Longfellow*, 43 F.3d 318, 324 (7th Cir. 1994) (quoting *United States v. Hord*, 6 F.3d 276, 282 (5th Cir. 1993) ("risk of loss, not just loss itself, supports conviction" for bank fraud)); *United States v. Colton*, 231 F.3d 890, 907 (4th Cir. 2000); *see also* Pattern Criminal Federal Jury Instructions for the Seventh Circuit (1990), p. 217 (The mail interstate carrier wire fraud statute "can be violated whether or not there is any [loss or damage to the victim of the crime] [or] [gain to the defendant].").

More importantly, the whole purpose of § 3293(2) is to protect financial institutions, a goal it tries to accomplish in large part by deterring would-be criminals from including financial institutions in their schemes. Just as society punishes someone who recklessly fires a gun, whether or not he hits anyone, protection for financial institutions is much more effective if there's a cost to putting those institutions at risk, whether or not there is actual harm. Accordingly, we find no error in the district court's jury instruction.

Serpico next argues that, even if the district court correctly interpreted § 3292(2), his schemes did not "affect"

a financial institution because they did not create increased risks for the banks involved in the schemes. Essentially, Serpico claims that the banks in both schemes were willing participants who would not have chosen to participate unless it was in their best interests (that is, factoring in the risks, they expected to make money on the deals). But the mere fact that participation in a scheme is in a bank's best interest does not necessarily mean that it is not exposed to additional risks and is not "affected," as shown clearly by the various banks' dealings with Serpico.

For example, the hotel loan kickback scheme affected Mid-City even though Mid-City believed it would make money on the deal. Mid-City made a $6.5 million construction loan, one it obviously would not have made if it believed the risks associated with the loan outweighed the expected payoff. But the loan, as all loans do, did carry some risk. Since Mid-City did not want to be a long-term real estate lender, it agreed to the loan only after Serpico misappropriated Midwest Pension Plan ("MPP") funds in making the MPP's $6.5 million end-mortgage loan (which meant that, if all went well, Mid-City would quickly be repaid). Therefore, Mid-City never would have been exposed to the risks of its loan absent Serpico's scheme because it never would have made the loan.

Serpico responds that MPP's $6.5 million essentially guaranteed the loan, so there was no risk to Mid-City. But, under the terms of the loan, if the hotel was not completed on time and under budget, the money MPP put up would be returned to it. That would leave Mid-City with a risky long-term loan it didn't want. On top of that, the kickback scheme increased the chances that the project would run into trouble. Certainly a construction project is more likely to be delayed when those running it and putting up the money for it are doing so illegally,

making them subject to the disruption of investigation and arrest at any time.

The loans-for-deposits scheme shows even more dramatically that a bank can take on higher risk while acting in what it believes to be its own best interests. Banks, including Capitol Bank (which no longer exists as a result of punishments it received after pleading guilty to conspiring with Serpico and Busillo to defraud the CSJB entities), decided the benefits from the deposits made it worth the risk of loss resulting from the generous terms and conditions of the loans it gave Serpico. But the fact remained that the bank made risky loans at low interest rates that it never would have made absent the scheme.

In fact, at trial, Serpico's counsel told the court that "if the defendants were convicted of a loans-for-deposits scheme, that conduct in and of itself would mean that they affected a financial institution" and "I don't know I could conceivably argue that the particular scheme did not affect a financial institution." He now tries two arguments. In addition to arguing that the bank was acting in its own best interest, Serpico claims that a financial institution is not "affected" if it is an active perpetrator in the offense. We find that argument unpersuasive. It is not supported by *Ubakanma*, as Serpico claims, and we find it hard to understand how a bank that was put out of business as a direct result of the scheme was not "affected," even if it played an active part in the scheme.

Next, Serpico argues that he was prejudiced by the admission of evidence relating to various charges on which the district court acquitted him before the case went to the jury. In *United States v. Holzer*, 840 F.2d 1343, 1349 (7th Cir. 1988), we addressed almost this very issue:

> When, as is often the case (it was here), the jury acquits a defendant of some counts of a multi-count indictment, the defendant is not entitled to a new trial on

the counts of which he was convicted, on the theory that the conviction was tainted by evidence, which the jury heard, relating to the counts on which it acquitted. . . .  No rule of evidence is violated by the admission of evidence concerning a crime of which the defendant is acquitted, provided the crime was properly joined to the crime for which he was convicted and the crimes did not have to be severed for purposes of trial. It makes no difference, moreover, whether the jury acquits on some counts or the trial or reviewing court sets aside the conviction.

Serpico notes that his case is different in that the admitted evidence here concerned claims that the court dismissed before they reached the jury. Still, the *Holzer* reasoning applies. No rule of evidence was violated, and the district court did not abuse its discretion in failing to award a new trial to Serpico.

We also reject Serpico's claims that his conviction should be overturned or he is entitled to a new trial because there was not sufficient evidence to convict him and that the record does not permit a confident conclusion that Serpico is guilty beyond a reasonable doubt. Given the evidence, the jury reasonably concluded that the $333,850 payment to Cataldo was made in exchange for the loan from Serpico and that some of that $333,850 trickled down to Serpico.

Similarly, we reject Cataldo's claim that the district court abused its discretion in denying his severance motion. To succeed, Cataldo must show that he was "unable to obtain a fair trial, not merely that a separate trial would have offered [him] a better chance of acquittal." *United States v. Bruce*, 109 F.3d 323, 327 (7th Cir. 1997). Cataldo claims he should have been tried separately because there was a gross disparity in the evidence presented against him and his co-defendants. But a "simple 'disparity in the evidence' will not suffice to support a

motion for severance," *United States v. Caliendo*, 910 F.2d 429, 438 (7th Cir. 1990). Moreover, the trial court instructed the jury to consider the evidence against each defendant individually, and juries are presumed to be capable of following such limiting instructions. *United States v. Williams*, 858 F.2d 1218, 1225 (7th Cir. 1988). Because there is no reason the jury here could not follow that instruction, the district court did not abuse its discretion in denying Cataldo's motion.

Finally, both Serpico and the government challenge the district court's application of the sentencing guidelines. Serpico challenges the calculation of the loss from both schemes. With regards to the hotel loan kickback scheme, Serpico claims that the union entities suffered no loss because the loan was repaid (the district court found the loss attributable to both defendants to be $333,850, the amount paid to Cataldo). But Serpico's theory fails to consider the fact that, although none of the $6.5 million was lost, more money could have been earned. Obviously, the 51 Associates partnership was willing to pay (and did pay) an extra $333,850 in order to secure the loan. That money could have gone to the union entities instead of Cataldo if Serpico had been acting in the entities' best interests instead of his own. *See generally United States v. Briscoe*, 65 F.3d 576, 589 (7th Cir. 1995) (kickbacks "represent money that should have gone to the Union" and, as such, were properly included in the loss calculation).

We also reject Serpico's alternative argument that he (individually, as opposed to with Cataldo) should only be accountable for the $25,000 that Cataldo kicked back to him. Serpico and Cataldo are each accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG §1B1.3(a)(1)(B). Since Serpico knew money was going to be paid back to Cataldo for work he never did, the district court correctly held him responsible for the full $333,850 loss.

Serpico also argues that, in computing the losses from the loans-for-deposits scheme, the district court should not have included losses arising from CD purchases from banks other than Capitol because the court did not have sufficient evidence to support a conclusion that the scheme extended to those banks. But the 12-year pattern of union deposits into banks from which Serpico simultaneously sought personal loans, combined with documents from Gladstone-Norwood Bank and Exchange Bank suggesting that loans were approved in order to secure union deposits, presented sufficient evidence.

In its cross-appeal, the government first claims the district court applied the wrong offense guideline. The district court calculated the defendants' sentences under §2F1.1 (the fraud guideline), but the government argues it should have applied §2E5.1 (the benefit plan bribery guideline) during sentencing. We review the district court's selection of the applicable guideline section *de novo*. *United States v. Dion*, 32 F.3d 1147, 1148 (7th Cir. 1994).

Clearly, the government wants it both ways; having chosen to prosecute Serpico under the mail fraud statute, it wants him sentenced based on bribery. As unjust as this practice might seem in a case like this (Serpico essentially would be sentenced for a crime, bribery, he could not have been charged with because the statute of limitations had run), the guidelines not only allow but even encourage this scheme, which someone could argue is a little like an old bait-and-switch. Under §1B1.2(a), however, the district court is instructed to "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information of which the defendant was convicted)." USSG §1B1.2(a) (1990). The commentary to that section elaborates: "When a particular statute proscribes a variety of conduct that might constitute the subject of different

offense guidelines, the court will determine which guideline section applies based upon the nature of the offense conduct charged in the count of which the defendant was convicted." §1B1.2, comment. (n.1). In other words, as in *United States v. Hauptman*, 111 F.3d 48 (7th Cir. 1997), the sentencing judge should endeavor to locate the "essence" of the defendant's conduct, not merely the name attached to the statute violated.

Therefore, §1B1.2(a) encourages the district court to find an appropriate guideline section to fit the conduct (not just the charge). Section 2F1.1 of the 1990 guidelines, under which Serpico was convicted and sentenced, notes:

> [T]he mail or wire fraud statutes, or other relatively broad statutes, are used primarily as jurisdictional bases for the prosecution of other offenses. . . . Where the indictment or information setting forth the count of conviction (or a stipulation as described in §1B1.2(a)) establishes an offense more aptly covered by another guideline, apply that guideline rather than §2F1.1.

§2F1.1, comment. (n.13).

The indictment charged that Serpico "sought and received a substantial personal benefit and kickback in exchange for influencing" the MPP to provide the $6.5 million loan, which is closer to bribery than mail fraud (in §2E5.1, a "bribe" is "the offer or acceptance of an unlawful payment with the specific understanding that it will corruptly affect an official action of the recipient." §2E5.1, comment. (n.1)). Similarly, the loans-for-deposits scheme was basic bribery, with Serpico promising union deposits to the banks in exchange for favorable personal loans. Therefore, the district court should have sentenced Serpico under §2E5.1.

Finally, the government argues that the district court erred by failing to consider the approximately

$475,000 that Serpico derived from the loans-for-deposits scheme through his investment in Studio Network. The government argues that it showed that Serpico invested $25,000 in the partnership in 1983, then sold his share 5 years later for $500,000. The government claims that the district court should have used Serpico's gain as an alternative measure of loss under §2F1.1 (which also would be used under §2E5.1). *See* §2F1.1, comment. (n.8) ("The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.").

We have interpreted §2F1.1 of the 1990 guidelines to require that the amount of loss be based on "the net detriment to the victim." *See United States v. Mount*, 966 F.2d 262, 265. Therefore, the defendant's gain should only be used when the loss to the victim cannot be reasonably estimated (as the 2001 guidelines make clear: "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."), §2B1.1, comment. (n.2(B)). The district court reasonably estimated the loss from the loans-for-deposits to be equal to the additional amount the union entities could have earned at banks offering more favorable rates on CDs. To use the $475,000 that Serpico earned suggests that the unions would have received an astounding 1,900 percent return on their investments, a wholly unsubstantiated claim.

To summarize: We affirm the convictions and the loss calculations but remand for sentencing under §2E5.1.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*