**UNITED STATES of America,**

v.

**RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, et al., Defendants.**

No. 09 Cr. 1058.

United States District Court, S.D. New York.

Dec. 14, 2011.

Rebecca Meiklejohn, Steven Tugander, Charles Vincent Reilly, Eric C. Hoffmann, Kevin Bradford Hart, U.S. Department of Justice, Antitrust Division, New York, NY, Lucy Pepe McClain, U.S. Department of Justice, Antitrust Division, Philadelphia, PA, for United States of America.

Richard William Beckler, Robert H. Cox, Howrey LLP, Washington, DC, Adam Stewart Katz, Bradley Drew Simon, Brian David Waller, Kenneth Charles Murphy, Simon & Partners, LLP, John Joseph Kenney, Laura B. Hoguet, Hoguet Newman Regal & Kenney, LLP, Juan Alden Skirrow, Willkie Farr & Gallagher LLP, Michael Gerard McGovern, Steven S. Goldschmidt, Ropes & Gray, LLP, New York, NY, Daniel Louis Zelenko, Shamiso Kristen-Faith Maswoswe, Crowell & Moring LLP, New York, NY, Donald Etra, Law Office of Donald Etra, Los Angeles, CA, Amanda Nicole Raad, Ropes & Gray LLP, Chicago, IL, Jeffrey H. Rutherford, Crowell & Moring LLP, San Francisco, CA, for Rubin/Chambers, Dunhill Insurance Services, et al., Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Before the Court is the motion to exclude evidence relating to monetary settlements of financial institutions (Docket No. 291) submitted by defendants Rubin/Chambers, Dunhill Insurance Services, Inc. ("CDR"); David Rubin ("Rubin"); Zevi Wolmark a/k/a Stewart Wolmark ("Wolmark"); and Evan Andrew Zarefsky ("Zarefsky") (collectively, "Defendants"). In resolving this motion, the Court presumes familiarity with the docket and all prior decisions and orders in this case.

After carefully considering the arguments presented by the parties' memoranda and the facts set forth in those and the accompanying papers, and for the reasons discussed below, Defendants' motion is DENIED, in part, and GRANTED, in part.

## I. BACKGROUND

Certain financial institutions, specifically UBS AG ("UBS") and JPMorgan Chase & Co. ("JPMorgan"), have entered into non-prosecution agreements (the "Non–Prosecution Agreements") with the Department of Justice Antitrust Division (the "Antitrust Division") regarding their employees' participation in conduct related to bid-rigging in the municipal derivatives market. The UBS agreement is dated May, 4, 2011 and the JPMorgan agreement was signed on July 7, 2011. (Gov't's Mem. in Opp. to Defs' Joint Motion to Exclude Monetary Settlements (the "Gov't Brief") (Docket No. 298) at 6–7.) Another financial institution, Banc of America Securities LLC ("BoA," together with UBS and JPMorgan, the "Settling Financial Institutions") entered into a settlement agreement (the "BoA Agreement," together with the Non–Prosecution Agreements, the "Agreements") with the Securities and Exchange Commission (the "SEC"), which was similarly related to the conduct of BoA employees in the municipal derivatives industry. Each of the Settling Financial Institutions is referenced in the Superseding Indictment (Docket No. 67)

as a co-conspirator. The Non–Prosecution Agreements contain explicit admissions that employees of UBS and JPMorgan knowingly and actively participated in the conduct charged in the Superseding Indictment. (*See* Gov't Brief, Ex. A at 2 (UBS agreement including admission and acceptance of responsibility for employees' "enter[ing] into unlawful agreements to manipulate the bidding process and rig bids on certain relevant municipal contracts"); Ex. C at 2 (JPMorgan agreement containing same admission).) BoA entered into its settlement, however, "without admitting or denying the findings" presented by the SEC in the order terminating its action against BoA. (*See* Gov't Brief, Ex. E at 1.)

The Government intends to introduce evidence and testimony regarding the Agreements to establish that the wire fraud and conspiracy to commit wire fraud counts in the Superseding Indictment "affect[ed] a financial institution," as required under 18 U.S.C. § 3293(2). If the "offense" charged in the Superseding Indictment "affect[ed] a financial institution," then § 3293 increases the applicable statute of limitations for the wire fraud counts from five years to ten years, *see* 18 U.S.C. § 3293, and the statutory maximum term of imprisonment is increased from twenty years to thirty years, *see* 18 U.S.C. § 1343. In asserting that the schemes to defraud alleged here "affect[ed] a financial institution," the Government relies on language added in the Superseding Indictment that explicitly references certain co-conspirators' status as financial institutions. The Government also points to statements made by its attorney prior to filing the Superseding Indictment that related to the ten-year limitations period and *United States v. Ohle*, 678 F.Supp.2d 215 (S.D.N.Y.2010), which applied § 3293 to co-conspirator banks.

Defendants assert both substantive and procedural reasons to exclude evidence and argument related to the Agreements.

Defendants' substantive argument is that evidence of the Agreements is of questionable relevance to whether the institutions were "affect[ed]" by the charged conduct because financial institutions settle claims or charges brought by regulators and prosecutors for a variety of reasons other than a simple acceptance of responsibility. Drawing support from recent cases in this District that point out that some settlements do not contain factual admissions of guilt, Defendants assert that the Agreements in and of themselves do not prove that the specific conduct charged by each particular wire fraud count caused the Settling Financial Institutions to pay out the monetary settlements. Accordingly, Defendants argue that, for § 3293 to apply, the Government must demonstrate that the payments required by the Agreements were the "sufficiently direct" result of the Settling Financial Institutions' participation in the charged acts of wire fraud and that their participation in the charged conduct—and not other business concerns—caused them to enter into the Agreements. Because such a showing would require the Government to prove facts regarding the Settling Financial Institutions' intent in participating in the charged conduct and decision-making processes in entering into the Agreements, Defendants predict that a range of Confrontation Clause and evidentiary problems will arise which would necessitate supplementary discovery, an evidentiary hearing and other relief aimed at facilitating Defendants' response to the Government's proof.

The Government responds by highlighting the "broad" reading of § 3293 compelled by controlling authority and arguing that, under those cases, a financial institu-

tion that participates in a fraudulent scheme may be "affect[ed]" by that scheme if it ultimately accepts responsibility and pays out a financial settlement related to the fraud. Accordingly, the Government asserts that evidence of the Agreements is directly relevant to whether the Settling Financial Institutions participated in the fraud and were affected by the fraud for purposes of § 3293. As to Defendants' constitutional and evidentiary concerns, the Government asserts that additional evidence [1] related to the Agreements will be straightforward and non-testimonial, merely requiring proof of the contents of the Agreements and limited testimony of executives at the Settling Financial Institutions.

Defendants also assert a procedural reason for barring the introduction of evidence related to the Agreements, namely, notice. Defendants argue that the Government provided them notice that it would invoke the ten-year statute of limitations in § 3293 only when it first disclosed, on October 31, 2011, the witnesses and exhibits at issue on this motion. Defendants argue that at no point prior to October 31, 2011 did the Government disclose the witnesses or documents it now seeks to introduce, though it made several productions of documents and disclosures of trial evidence and witnesses in the preceding year. Defendants further argue that the Superseding Indictment did not allege that any financial institution was "affect[ed]," and that the Government's subsequent litigation presumed the inapplicability of the ten-year statute of limitations under § 3293. Defendants argue that they are prejudiced by the Government's sudden decision to invoke § 3293 and will be un-

able to adequately prepare their case in light of the newly disclosed documents and witnesses.

Beyond the evidentiary question of the relevance of the Agreements to satisfying § 3293, much of the dispute between the parties turns on their differing interpretations of the Superseding Indictment and events in this litigation. The Court will now examine that legal question and those competing accounts.

## II. ANALYSIS

### A. EVIDENCE OF "AFFECT[ING] A FINANCIAL INSTITUTION" UNDER SECTION 3293

█ The application of § 3293 is not limited to circumstances in which a financial institution is the object or victim of a scheme to defraud. *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir.1998). Rather, the effect on the financial institution need only be a "sufficiently direct" result of the offense to trigger the ten-year statute of limitations. *Id.* Moreover, "the extended limitations provision requires only that the 'offense'—meaning the entire scheme—affect the financial institution, not that individual [uses of the wires] do so[,]" and therefore the only necessary evidence is that evidence sufficient to connect the purported effect to the fraudulent scheme as a whole rather than to particular overt acts. *United States v. Martinez*, No. 98–1438, 172 F.3d 39, 1999 WL 38842, at *2 (2d Cir.1999).

█ A financial institution is "affect[ed]" by a fraudulent scheme where it actively participated in the scheme and experienced financial losses in the form of legal settlements and costs as a result of

---

**1.** Regardless of whether "affect[ing] a financial institution" is at issue during trial, the Government's case-in-chief will include testimony regarding the Settling Financial Institu-

tions' participation in the charged fraudulent conduct as a part of establishing the underlying fraud. (*See* Gov't Brief at 4–5.)

that participation.[2] *Ohle,* 678 F.Supp.2d at 229; *see also United States v. Daugerdas,* No. 09 Cr. 581, 2011 WL 6020113, at *1 (S.D.N.Y. Apr. 5, 2011). As explained by the Court of Appeals for the Seventh Circuit, "the whole purpose of § 3293(2) is to protect financial institutions, a goal it tries to accomplish in large part by deterring would-be criminals from including financial institutions in their schemes." *United States v. Serpico,* 320 F.3d 691, 694 (7th Cir.2003) ("[T]he mere fact that participation in a scheme is in a bank's best interest does not necessarily mean that it is not exposed to additional risks and is not 'affected.' ").

### 1. *The BoA Settlement*

■ The BoA Settlement, unlike the Non–Prosecution Agreements, does not contain an express admission of guilt. Rather, as discussed above, it features language disclaiming any factual admissions. Therefore, the BoA Settlement is not direct evidence of an "[e]ffect [on] a financial institution" because—as Defendants point out—in the absence of an admission of guilt, there are many possible explanations for BoA's decision to enter the settlement agreement. The agreement itself does not firmly establish a direct link between the fraudulent scheme alleged in the Superseding Indictment and BoA's payments to regulators. Accordingly, the BoA Settlement is weak evidence of an effect on a financial institution within the meaning of § 3293.

Evidence related to the BoA Settlement may have some probative value as to the effect of the charged scheme on that institution. However, any probative value of the BoA Settlement is greatly diminished by its failure to include an admission of participation in the scheme to defraud from which the bank suffered actual losses. As Defendants point out, the language of the settlement agreement fails to establish BoA's participation in the scheme or to directly connect such participation to actual losses from the monetary payment made. The factual circumstances surrounding the BoA Settlement might support the application of § 3293, but those circumstances would need to be drawn out through the extensive presentation of additional evidence, including testimony from several BoA employees—both those who participated in the underlying scheme to defraud and those who negotiated and accepted the settlement. This testimony and accompanying evidence would necessarily deal with the complicated and collateral issue of how a large bank interacts with regulators and makes decisions regarding settlements. Such testimony and evidence would also raise the specter of serious jury confusion due to the juxtaposition of that complex subject matter against the simple and common sense conclusion that a bank would not settle serious charges of wrongdoing involving significant monetary penalties unless it had committed the alleged offense. Though BoA may have entered into the settlement agreement in recognition of its participation in the fraud conspiracy at issue in this prosecution, the BoA Settlement itself does not demonstrate that motivation; the evidence necessary to do so could lead to a high degree of confusion, delay and prejudice. Accord-

---

**2.** *United States v. Carollo,* No. 10 Cr. 654, 2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011), is thus readily distinguishable. In *Carollo,* there was no evidence of actual settlement payments. *Id.* at *2 ("Here, the government does not allege that Financial Institutions A and B suffered any actual loss, and merely argues that the kickback arrangements exposed them to a risk of loss without providing much explanation as to what that risk is other than the expenses associated with litigation."). The situation in *Carollo,* therefore, lacked the admission of guilt and actual payment of settlements at issue here.

ingly, evidence of the BoA Settlement will be excluded under Federal Rule of Evidence 403.

### 2. *The Non–Prosecution Agreements*

■ The Non–Prosecution Agreements include express admissions by UBS and JPMorgan that their employees participated in the bid manipulation scheme underlying the fraud charges in the Superseding Indictment. Further, the Non–Prosecution Agreements are explicitly based upon both banks' admission of guilt and their "monetary commitments" to the agencies with which they were settling. (Gov't Brief, Ex. A at 2; Ex. C at 2.) Thus, the terms of the Non–Prosecution Agreements are sufficiently direct evidence establishing that the fraud offenses charged in the Superseding Indictment "affect[ed]" UBS and JPMorgan because the Non–Prosecution Agreements demonstrate that those banks participated in the fraud charged and suffered actual monetary losses as a result of their participation. The Non–Prosecution Agreements are therefore highly relevant to the applicability of § 3293.

However, such evidence may also entail significant risks of prejudice, delay and jury confusion. As discussed above, evidence regarding any of the Agreements entered into by the Settling Financial Institutions may prejudice Defendants because a jury may infer that if major banks paid large sums of money to the government in relation to the circumstances underlying Defendants' prosecution, then those circumstances support criminal liability for Defendants. In recognition of those risks, the Government will be permitted to present such testimony and documentary evidence only for the limited purpose of establishing the applicable statute of limitations, and only to that extent necessary to show that UBS and JPMorgan admitted to participating in the conduct alleged in the Superseding Indictment and suffered actual losses from monetary payments to settle related charges. To prove the applicability of § 3293, the Government need not disclose the specific monetary figures or other terms of the settlements. Furthermore, the Court may provide an appropriate limiting instruction to ensure that the jury considers evidence of the Non–Prosecution Agreements only for purposes of determining whether the offenses "affect[ed] a financial institution."

Accordingly, the Court expects that the Government will require minimal explanatory testimony regarding the pertinent terms of the Non–Prosecution Agreements to establish that the payments required under those agreements constitute "[e]ffects" under § 3293. No more is required and anything more risks unnecessary prejudice and delay.

### B. *NOTICE TO DEFENDANTS*

Defendants present two related arguments as to notice. First, Defendants assert that the Superseding Indictment did not notify them that the Government would seek recourse to the ten-year statute of limitations under § 3293. Second, Defendants argue that if the Government is permitted to pursue the application of § 3293, they will be prejudiced by the Government's tardy disclosure of the witnesses and documents at issue in their motion. Defendants maintain that, to avoid this prejudice, the Government's late notification of witnesses and evidence justifies discovery and other related relief.

To understand what notice was or was not provided in the Superseding Indictment, some context is required. At a November 12, 2010 status conference before the Court, the Government referred by name to the *Ohle* case and expressed its

position that the ten-year statute of limitations applied to the fraud counts on the theory that financial institutions are "affect[ed]" by fraudulent schemes in which they participate. (Docket No. 66 at 5.) *Ohle* could be read to support the application of § 3293 any time a financial institution participated as a co-conspirator and was thereby exposed to an increased risk of liability arising from the underlying fraudulent scheme. *See,* 678 F.Supp.2d at 229 ("In using Bank A as a central player in the HOMER conspiracy, Ohle and his co-conspirator's [sic] knew they were exposing it to risk if their fraud was uncovered.").[3] In discussing *Ohle* and the ten-year statute of limitations, the Government was previewing the changes and legal theories it "contemplate[d]" in crafting the then-forthcoming Superseding Indictment. (Docket No. 66 at 5.)

On December 7, 2010, the Government filed the Superseding Indictment. But, unlike indictments in other prosecutions cited by Defendants, the Government did not expressly invoke § 3293 or title the wire fraud counts as "affect[ing] a financial institution." Instead, the Superseding Indictment simply added paragraphs that defined certain co-conspirators as "financial institutions." (Superseding Indictment ¶¶ 56–57.)

■ While not the most overt invocation of § 3293, the amended language does allege that Defendants were joined in their fraudulent scheme by financial institution co-conspirators. Under the interpretation

of § 3293 set forth in *Ohle* and argued by the Government at the November 12, 2010 conference, such allegations are sufficient to alert Defendants to the Government's position that § 3293 applied to this case.

Defendants argue that numerous representations made by the Government subsequent to the issuance of the Superseding Indictment demonstrate that the Government had abandoned the ten-year statute of limitations. Defendants assert that, at the very least, such statements misled them into believing that the Government would no longer seek application of § 3293.

Defendants' interpretation of the Government's statements and actions is not persuasive. Notably, Defendants have offered no alternative explanation or purpose for the Government's addition in the Superseding Indictment of specific language defining co-conspirators as financial institutions. At the time the Government issued the Superseding Indictment, it advanced the position that the phrase " 'affects a financial institution' . . . can mean that the financial institution itself is the perpetrator of the fraud and not just the victim." (Docket No. 66 at 5.) To substantiate that theory, the Government needed only to show that the financial institution participated in the conspiracy.

As it was proceeding under the theory that a financial institution's participation in a scheme to defraud triggered § 3293, it was entirely predictable and appropriate that the only relevant changes in the Superseding Indictment were to identify co-

---

**3.** Since the Government issued the Superseding Indictment and first invoked *Ohle,* this case has come to resemble *Ohle* and the cases it cites even more squarely. The co-conspirator financial institutions' risk of liability arising from the fraudulent scheme has come to fruition in the form of the Agreements at issue in this motion. Thus, though the Court in *Carollo* recently rejected the theory under which the Government amended the charges

in this case, evidence now available to the Government permits it to establish the applicability of § 3293 even under the terms discussed in *Carollo. See* 2011 WL 3875322, at *2 ("The law appears relatively clear that [§ 3293 applies] where illegal activity caused a financial institution to be susceptible to substantial risk of loss and *that institution suffered actual loss* . . . .") (emphasis added).

conspirators as financial institutions. Moreover, the Government's reliance on that theory also explains why it did not add any witnesses or exhibits to preliminary lists generated in early 2011: The Agreements now at issue were not yet extant, and the evidence and witnesses required to show that financial institutions participated in the scheme and were thereby exposed to significant risks of suffering actual losses would be produced among the broad discovery required to demonstrate the basic participants and facts related to the charged frauds. The Government's explication of the Superseding Indictment in a cover letter—which casts the additional language as minimal because it would necessitate no new discovery—is therefore consistent with its theory of § 3293. (*See* Declaration of Daniel L. Zelenko (Docket No. 293), Ex. F at 2–3.)

Defendants' second notice argument may be more summarily dispatched. Because the Court finds that only limited evidence of the Non–Prosecution Agreements is relevant and admissible, the scope of Defendants' response to that evidence is correspondingly narrowed. Since there is no need for Defendants to take discovery or examine witnesses regarding the reasons that either UBS or JPMorgan entered into the Non–Prosecution Agreements, Defendants have suffered no prejudice by their inability to do so in the time remaining before trial. Defendants' cross-examinations and arguments will be limited to the relevant issues, namely, whether UBS and JPMorgan admitted to participation in the charged fraudulent schemes, and whether that participation thereby resulted in actual pecuniary losses to those financial institutions.

In sum, because evidence of the Non–Prosecution Agreements directly establishes that the fraudulent scheme alleged in the Superseding Indictment "affect[ed]

a financial institution" and that the attendant risks of prejudice and delay can be mitigated, Defendants' motion is DENIED, in part, as to the Non–Prosecution Agreements. Because the BoA Settlement cannot establish that the fraudulent conduct "affect[ed] a financial institution" without extensive evidence and testimony as to the collateral issue of BoA's decision-making process leading to its settlement, Defendants' motion is GRANTED, in part, as to evidence related to the BoA Settlement.

### III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 291) to exclude evidence relating to monetary settlements of financial institutions submitted by defendants Rubin/Chambers, Dunhill Insurance Services, Inc.; David Rubin; Zevi Wolmark a/k/a Stewart Wolmark; and Evan Andrew Zarefsky, is **DENIED in part** and **GRANTED in part** in accordance with this decision and order.

**SO ORDERED.**