**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James O'CONNOR,**
**Defendant–Appellant.**

**No. 88–1712.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 28, 1988.

Decided May 18, 1989.

Dominic H. Frinzi, Milwaukee, Wis., for defendant-appellant.

Mel S. Johnson, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CUDAHY and MANION, Circuit Judges, and WILL, Senior District Judge.[*]

---

* Hon. Hubert L. Will, Senior District Judge, United States District Court for the Northern District of Illinois, is sitting by designation.

MANION, Circuit Judge.

Defendant–Appellant James A. O'Connor was indicted on nine counts (1–7, 9, and 11) of wire fraud in violation of 18 U.S.C. § 1343,[1] and on two additional counts (8 and 10) charging that he caused another person to travel in interstate commerce for the purpose of executing or concealing a scheme to defraud in violation of 18 U.S.C. § 2314.[2] A jury acquitted O'Connor on two counts (1 and 2), but convicted him on all others (3–11). The district court sentenced O'Connor to seven years imprisonment on Counts 3, 4, 6, 7, 9, 10, and 11 to be served concurrently, followed by five years probation on Counts 5 and 8. O'Connor appeals his convictions under both 18 U.S.C. § 1343 (except as concerns Count 6) and 18 U.S.C. § 2314. He also appeals his sentence. We affirm the convictions, but remand to the district court to correct a sentencing error.

## I.

O'Connor was involved in two similar but separate fraudulent schemes, the facts of which are undisputed. During the spring of 1982, O'Connor was the president of Telephone House of Milwaukee, or Telephone House, Inc., a telephone retail company ("Telephone House"). In April 1982, O'Connor purchased used telephone equipment from the British Columbia Telephone Company ("BC Telephone") for $6,500, which he paid for in cash. In May 1982, O'Connor arranged for a second purchase from BC Telephone, paying the agreed-upon $9,500 purchase price with a $10,000 certified check. Later that month, O'Connor ordered an additional $65,000 worth of telephone equipment from BC Telephone. BC Telephone shipped the equipment on O'Connor's promise to send a check in payment for the goods. O'Connor received the shipment, but BC Telephone was never paid.

O'Connor sent BC Telephone two separate checks, each in the amount of $65,000 in June 1982. Both checks were drawn against Telephone House's checking account at the Bay View State Bank in Milwaukee. The first check was never presented for payment. The second check was presented, but was dishonored by the bank for insufficient funds.

Subsequently, O'Connor had several telephone conversations with BC Telephone representatives John Burden and Don Pearson regarding the dishonored check. The relevant calls were placed on September 17, September 28, and November 1, 1982. During the September 17 telephone call, O'Connor explained to Burden that the check had bounced because a fire in Telephone House's warehouse had left its assets "frozen." On September 28, O'Connor told Burden that Telephone House's lawyer had instructed its insurance company to pay a portion of the fire insurance proceeds directly to BC Telephone. However, neither O'Connor nor the lawyer ever sent such a letter to the insurance company. (Telephone House eventually collected $170,806.42 in insurance proceeds on the contents from the burned warehouse; however, BC Telephone received nothing.) On November 1, O'Connor promised Burden that the overdue payment would be made no later than November 15. No payment was received by November 15.

---

**1.** Section 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1343.

**2.** Section 2314 provides in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more [ ]
>
> * * * * * *
>
> [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Throughout O'Connor's dealings with BC Telephone, Telephone House never had sufficient funds to pay for the equipment it had ordered and received. From March to September 1982, the highest daily balance in Telephone House's checking account was a mere $471.23. On June 21, 1982, when O'Connor wrote the $65,000 check that was later dishonored, Telephone House's checking account was already overdrawn by $1,300. In all, nearly 80 checks were written and dishonored on the Telephone House account from May through August 1982.

By 1984, O'Connor and Telephone House had established contact with TME, Inc., ("TME") and Demco, Inc., ("Demco") two Alabama businesses. TME was a marketing firm run by Ray Barter. Demco recycled old telephone housings and other types of plastic equipment. It was owned by Don McClain. Barter sold Demco's recycled plastic on a commission basis.

In May 1984, O'Connor traveled to Montgomery, Alabama, to purchase used plastic telephone housings worth approximately $6,000 from TME. O'Connor paid cash for the purchase. In September 1984, O'Connor ordered additional scrap telephones from TME and Demco. (Although the record does not indicate precisely when O'Connor received the scrap telephones, the parties agree that he received the telephones before making the calls which are the subject of the indictment.) O'Connor sent a series of checks drawn on an account at the Bay View State Bank for the September purchases. Ten checks in all were sent to cover the $106,750 purchase price. All ten checks were returned for insufficient funds.

At O'Connor's request, Barter came to Milwaukee on September 25 and 26 to discuss Telephone House's difficulty in making payment. On September 30, O'Connor invited Barter to return to Milwaukee, saying that he expected to receive funds sufficient to cover his debts within one to two days. Both Barter and McClain traveled to Milwaukee on October 1. Once they arrived, O'Connor stated that he expected the funds shortly, and gave Barter and McClain three checks in the amounts of $52,000, $37,750, and $17,000.

The three checks bounced. In a subsequent telephone call, O'Connor again persuaded Barter to come to Milwaukee in the hope of arranging a settlement. O'Connor explained to Barter that he planned to mortgage the Telephone House building, and that by the time Barter arrived in Milwaukee, there would be sufficient funds to pay Barter. Barter made one or two additional trips to Milwaukee at O'Connor's invitation. During these visits, he received three more checks, all of which were returned for insufficient funds. As with BC Telephone, there was no hope that Telephone House would ever pay TME. From June through December 1984, Telephone House's checking account balance never exceeded $667.25. At one point, the account was overdrawn by some $89,758.05.

BC Telephone, TME, and Demco did not take any legal steps to recover their losses until well past the telephone calls and trips described in the indictment. BC Telephone finally brought a civil action against O'Connor and Telephone House in 1983. BC Telephone and TME (together with another company not relevant here) forced Telephone House into involuntary bankruptcy in December 1984.

Counts 3–5 of the indictment charged that O'Connor's September 17, September 28, and November 1, 1982 telephone calls with BC Telephone violated 18 U.S.C. § 1343. Counts 7 and 9 alleged that O'Connor's September 30, 1984 and October 17, 1984 calls to Barter, where he invited Barter to Milwaukee, violated 18 U.S.C. § 1343. Counts 8 and 10 charged that O'Connor induced Barter to travel to Milwaukee to execute or conceal his fraudulent scheme in violation of 18 U.S.C. § 2314. Finally, Count 11 alleged that a November 1984 telephone call by O'Connor to Barter violated 18 U.S.C. § 1343.

On appeal, O'Connor argues that all of the acts charged in the indictment occurred after the respective schemes to defraud had reached fruition. As a result, he asserts, they were not in furtherance of the schemes. He thus seeks the reversal of his

convictions under 18 U.S.C. § 1343 and 18 U.S.C. § 2314. O'Connor also challenges his convictions under 18 U.S.C. § 2314 on the grounds that Barter, the individual who was induced to travel, was not a "victim" of any fraudulent scheme, and that corporations, such as TME, are not "persons" within the meaning of § 2314. Finally, O'Connor appeals the length of his sentence, claiming it exceeds the statutory maximum.

## II.

### A. *Wire Fraud*

■ The telephone calls charged in the indictment occurred after O'Connor had received the merchandise from BC Telephone and TME. Even so, they were intended to further the schemes by lulling his victims (BC Telephone and TME) into not acting. O'Connor disagrees, arguing that because he had already received the merchandise by the time the calls were made, the calls could not have been in furtherance of the scheme. In other words, O'Connor says the scheme was complete upon his receipt of the merchandise, thus, by definition, any calls placed after that time could not have furthered the already completed scheme. His argument is without merit.

Both the Supreme Court and this circuit have squarely rejected O'Connor's position, recognizing that calls made after the time that goods have been fraudulently obtained can nevertheless further the fraudulent scheme by making detection or apprehension less likely. *United States v. Lane*, 474 U.S. 438, 451–52, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986); *United States v. Sampson*, 371 U.S. 75, 81, 83 S.Ct. 173, 176, 9 L.Ed.2d 136 (1962); *United States v. Eckhardt*, 843 F.2d 989, 994 (7th Cir.) *cert. denied*, —— U.S. ——, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988); *United States v. Shelton*, 669 F.2d 446, 458 (7th Cir.) *cert. denied, sub nom. Bledsoe v. United States*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982); *United States v. Ledesma*, 632 F.2d 670, 677–78 n. 11 (7th Cir.) *cert. denied*, 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980); *United States v. Rauhoff*, 525 F.2d 1170, 1176 (7th Cir.1975); *United States v. Riedel*, 126 F.2d 81, 83 (7th Cir.1942). This is the so-called "lulling" theory. As this court explained some time ago:

> [a] scheme to defraud may well include later efforts to avoid detection of the fraud. A fraudulent scheme would hardly be undertaken, save for profit to the plotters. Avoidance of detection and prevention of recovery of money lost by the victims are within, and often a material part of, the illegal scheme. Further profit from the scheme to defraud, as such, may be over, and yet the scheme itself be not ended.

*U.S. v. Riedel*, 126 F.2d at 83. We recently reaffirmed our approval of the "lulling" theory in *U.S. v. Eckhardt*, 843 F.2d 989. There, the defendant challenged the sufficiency of his indictment for wire fraud under 18 U.S.C. § 1343, arguing, like O'Connor, that the fraudulent scheme had been completed before the challenged calls were made. In rejecting this contention, we observed "that even mailings and calls which occur after the defendant has obtained the victims' money are in furtherance of the scheme if they facilitate concealment or postpone investigation of the scheme." 843 F.2d at 994 (citations omitted).

Obviously, O'Connor's numerous telephone conversations with BC Telephone and TME, though occurring after O'Connor received the merchandise, were designed to postpone his creditors' investigation and to prevent detection of his schemes.[3] His re-

---

3. For this reason, *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), is distinguishable. In that case, the defendant was charged with violating 18 U.S.C. § 1341. The indictment alleged that the defendant had used stolen credit cards, knowing his victims (the merchants) would use the mails to collect payment, thus creating a delay sufficient to allow the defendant to avoid detection. The Supreme Court, however, held these mailings were not made for the purpose of executing the fraudulent credit card scheme. The Court distinguished *U.S. v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, explaining that in *Sampson*, the mailings made the defendant's apprehension less likely. In contrast, the Court explained, the mailings in *Maze* actually increased the defendant's chances of detection or apprehension. *Maze*, 414 U.S. at 403, 94 S.Ct. at 650. O'Connor's calls were more like the mailings in *Sampson* because they less-

peated promises to pay, when in fact there was no real hope of fulfilling those promises, served to temporarily placate BC Telephone and TME, and were intended to "lull" them "into a false sense of security," thus making O'Connor's "apprehension less likely...." *U.S. v. Lane*, 474 U.S. at 451–52, 106 S.Ct. at 733 (quoting *United States v. Maze*, 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974)). Accordingly, the calls clearly were in furtherance of O'Connor's fraudulent schemes. We therefore affirm his convictions under 18 U.S.C. § 1343.

### B. *Interstate Travel to Conceal Fraud*

O'Connor advances three challenges to his convictions under 18 U.S.C. § 2314. First, he argues, similarly to his challenge to his wire fraud convictions, that the travel inducements were not in furtherance of any fraudulent scheme because they occurred after he had received the merchandise, and thus after the scheme had reached fruition. Next, O'Connor contends that the person who traveled (Barter) was not a victim of any fraud—it was TME, O'Connor says, who was defrauded—and that § 2314 requires a showing that a victim of the fraud was the person induced to travel. Finally, O'Connor asserts that a corporation, such as TME, is not a "person" within the meaning of § 2314. These too are meritless.

Section 2314 provides in part:

[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more[ ]

\* \* \* \* \* \*

[s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.

*Id.* We think the section's plain meaning encompasses the inducements to travel made in this case. Section 2314 speaks of inducing one to travel in order to execute or conceal a fraudulent scheme. Just as with the wire fraud statute, inducements to travel made after money or goods have been fraudulently obtained can conceal the scheme, thus furthering the overall scheme to defraud by preventing detection or postponing investigation. *See United States v. Johnson*, 504 F.2d 622, 627 (7th Cir.1974).

The inducements to travel here had the same purpose and effect as the telephone calls, namely, to conceal O'Connor's scheme. We therefore see no reason to distinguish these inducements from the "lulling" telephone calls. O'Connor invited Barter to Milwaukee in September 1984 to negotiate a settlement after several checks had bounced. Less than one week later, O'Connor again invited Barter north to Milwaukee with the promise that O'Connor expected to receive additional cash shortly. O'Connor gave Barter a promissory note and three substantial checks on October 1 during Barter's visit. After those checks bounced, O'Connor again persuaded Barter to come to Milwaukee to work out a settlement. O'Connor promised that he would be able to pay Barter by the time Barter arrived in Milwaukee. Of course, Barter never received the money. While the trips ostensibly were to reassure Barter that payment would be forthcoming, in reality they were designed to prevent the uncovering of O'Connor's fraud. With each trip O'Connor assured himself of more time, and hence further concealed his scheme. By repeatedly inducing Barter to travel to Milwaukee and holding out the false hope

---

ened the chances his fraud would be discovered. Had he not made the calls or the numerous promises to pay, his creditors would in all likelihood have become suspicious much sooner. Thus, O'Connor's calls lulled his victims into not acting and postponed his day of reckoning.

*Compare United States v. Kwiat*, 817 F.2d 440, 443 (7th Cir.), *cert. denied, sub nom. Kehoe v. United States*, — U.S. ——, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987) (mailings at issue did not hide "delicts" or "postpone" the defendant's "day of reckoning").

of reaching a settlement, O'Connor effectively concealed his scheme to defraud TME.

We now turn to O'Connor's remaining challenges to his convictions under § 2314. In essence, O'Connor argues that if anyone was defrauded, it was TME, and that corporations such as TME are not "persons" within the meaning of § 2314. O'Connor then observes that it was Barter who traveled to Milwaukee, not TME, and that Barter was not the victim of the scheme, TME was. Thus, the argument goes, no "person" who was a victim under § 2314 was induced to travel in interstate commerce.

Initially we agree with O'Connor that § 2314 "require[s] a showing that 'a *victim* was induced to travel in interstate commerce.'" *United States v. Kelly,* 569 F.2d 928, 935 (5th Cir.), *cert. denied,* 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978) (quotations omitted) (emphasis in original). After that, though, we part company. O'Connor's argument depends on the key assumption that a corporation is not a "person" within the meaning of § 2314. Relying on this, he is then able to argue that Barter and TME are separate, and that it was Barter who traveled in interstate commerce—as an individual, not as a corporate agent—and that Barter was not a victim of O'Connor's scheme. Under O'Connor's reasoning, not only was no victim induced to travel, there was no victim at all, at least as far as § 2314 is concerned, because a corporation (TME) was defrauded. O'Connor's argument is unconvincing.

It is true that § 2314 does not expressly state that corporations are included within the meaning of the term "persons." But that is not dispositive.[4] Indeed, there exists a near-presumption that the term "persons," when included in a statute, includes corporations. 1 U.S.C. § 1. "The word 'person' for purposes of statutory construction, unless the context indicates to the contrary, is normally construed to include 'corporations ... as well as individuals.'" *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 666, 99 S.Ct. 2529, 2537, 61 L.Ed.2d 153 (1979) (quoting 1 U.S.C. § 1).

If anything, the purpose and context of § 2314 persuades us that it includes rather than excludes corporations as "persons." Section 2314 was designed to discourage the taking and receiving of stolen goods. *United States v. McClain,* 545 F.2d 988, 994 (5th Cir.1977). "The ultimate beneficiary of the law, of course, is the property owner who thereby enjoys greater governmental protection of property rights." *Id.* We see no reason why Congress would not have wanted to discourage the stealing of corporate property any less than it wanted to discourage the stealing of a natural person's property. It is patently unreasonable to say Congress believed corporate property rights were somehow less deserving of protection than a natural person's. Because nothing in § 2314 indicates a contrary purpose, we hold that the term "person" contained in that section includes corporations.

Corporations act through their agents. Barter was TME's agent.[5] When Barter traveled to Milwaukee, he did so on TME's behalf. As we have seen, TME was a victim of O'Connor's fraudulent scheme. Therefore, a "victim" of O'Connor's scheme (TME acting through Barter) was induced to travel in interstate commerce to conceal O'Connor's scheme to defraud. We thus affirm O'Connor's convictions under 18 U.S.C. § 2314.

### III.

O'Connor was sentenced to seven years imprisonment, to be served concur-

---

**4.** Regarding O'Connor's argument that corporations are not "persons" within the meaning of § 2314, he states that support for his argument is apparent from "the written decisions" concerning § 2314. This is hardly helpful. O'Connor omitted any specific citation in support of his novel theory. And our research has not

uncovered which decisions he may have been referring to. Obviously, his general "citation" was grounded more in hope than in fact or law.

**5.** Although the record does not specifically state what Barter's title was, the record does indicate that he "ran" and "operated" TME.

rently, on Counts 3, 4, 6, 7, 9, 10, and 11.[6] Each of these counts, except for Count 10, was for wire fraud under 18 U.S.C. § 1343. (Count 10 involved 18 U.S.C. § 2314.) Thus, the district court apparently sentenced O'Connor to seven-year concurrent sentences on Counts 3, 4, 6, 7, 9, and 11. Section 1343, however, allows a maximum of only five years imprisonment. O'Connor argues his sentence exceeded the statutory maximum. Apparently he is right. (Section 2314 allows for imprisonment of up to ten years, and O'Connor does not challenge his sentence so far as Count 10 is concerned.)

O'Connor filed his notice of appeal on April 6, 1988. On August 25, 1988, the district court, on its own, modified O'Connor's sentence. It explained that it had mistakenly sentenced O'Connor to seven-year concurrent sentences for Counts 3, 4, 6, 7, 9, and 11. The court then reduced O'Connor's sentence to five years as to Counts 3, 4, 6, 7, 9, and 11, to be served concurrently. (O'Connor does not challenge the modified sentence.) This, however, the district court could not do. *United States v. Kerley*, 838 F.2d 932, 941 (7th Cir.1988).

"There is a general rule that an appeal suspends the power of the court below to proceed further in the cause, except to take such steps as will assist the appellate court in its determination." *United States v. Bastanipour*, 697 F.2d 170, 173 (7th Cir. 1982), *cert. denied*, 460 U.S. 1091, 103 S.Ct. 1790, 76 L.Ed.2d 358 (1983). This includes modifying illegal sentences. A sentence is a final judgment. When an appeal is properly taken, the district court is divested of its jurisdiction, and thus may not modify its judgment—the sentence—during the pendency of the appeal. *Berman v. United States*, 302 U.S. 211, 214, 58 S.Ct. 164, 166, 82 L.Ed. 204 (1937); *United States v. Hocking*, 841 F.2d 735, 736 (7th Cir.1988). The district court's act was a nullity. Unfortunately, therefore, we must remand to the district court to correct the admitted error in O'Connor's sentence.

For the foregoing reasons, we affirm O'Connor's convictions under 18 U.S.C. § 1343 and 18 U.S.C. § 2314. We remand, however, to the district court to resentence O'Connor on Counts 3, 4, 6, 7, 9, and 11 consistent with 18 U.S.C. § 1343.

AFFIRMED IN PART, REMANDED IN PART.

---

**6.** O'Connor was sentenced to five years probation on Counts 5 and 8, to commence upon his release from custody. He does not contest this part of his sentence.