In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1384

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN D. MCGOWAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 350—**John F. Grady,** *Judge.*

ARGUED FEBRUARY 24, 2009—DECIDED DECEMBER 22, 2009

Before ROVNER, WOOD and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury convicted Brian D.
McGowan of eighteen counts of wire fraud, in violation
of 18 U.S.C. § 1343, and one count of investment
advisor fraud, in violation of 15 U.S.C. §§ 80b-6(2) and 80b-
17. He was sentenced to a term of sixty-six months'
imprisonment and was ordered to pay restitution in
the amount of $182,470.12. On appeal, he disputes the
district court's decision to allow the main witness

against him to testify by videotaped deposition. He also challenges the charges against him on statute-of-limitations grounds. We affirm.

## I.

In 1986, when working as a warehouse manager in a discount department store, Camille LaMie was hit by a forklift. Although her injuries prevented her from returning to that job, she attempted to work at another store for a brief time as a customer service representative. Because her injuries made walking difficult, she left that job as well. Ultimately, she underwent spinal surgery and bone grafts, spending a year in a body cast. She was unable to collect workers' compensation because the discount store had declared bankruptcy. From the time of her injury until her father's death in 1993, LaMie lived on food stamps, Social Security Supplemental Income and Medicaid. After her father died, she inherited approximately $266,000 and a house in Chicago. All of her public assistance ended with her receipt of the inheritance and LaMie relied entirely on that money for her support.

By 1997, LaMie was fifty-four years old, unemployed, medically uninsured, and suffering from a variety of chronic medical problems including diabetes, hypothyroidism, chronic obstructive pulmonary disease, cirrhosis of the liver caused by an autoimmune disorder, clinical depression, diabetic neuropathy and hepatic failure. Her luck was about to get worse. Because she lacked health insurance, she became increasingly con-

cerned about her declining health and her ability to pay her ongoing medical expenses. She had been investing her money conservatively in certificates of deposit, but now sought to increase her rate of return and obtain a steady monthly income while at the same time keeping her principal safe. In September 1997, a friend introduced LaMie to Brian McGowan, a financial advisor. LaMie told McGowan that she needed no-risk investments and that she also needed health insurance. McGowan told her he would keep her principal safe and obtain health insurance for her. He told LaMie that his clients included Walter Payton, Michael Jordan and Michael Jordan's mother. In fact, he had never represented any of these people.

LaMie researched McGowan's background to the best of her ability and decided to invest the bulk of her inheritance with him. She paid him an up-front "consulting fee" of $2,500 and signed a customer agreement. Between September and December of 1997, LaMie invested $260,000 with McGowan. Needless to say, McGowan did not keep LaMie's principal safe. He told her he was placing $100,000 in Cypress Bioscience, a drug company that he characterized as "safe." He invested $8,200 in a commodities account that he intended to trade daily, which he told LaMie eliminated any risk. He banked $30,000 of her money in a "no risk" real estate deal, and told her he was placing $60,000 in Chicago Capital Holdings. He claimed to invest another $60,000 in an unspecified manner. McGowan did invest some of LaMie's money in real estate: he bought a house for himself in New Mexico. He invested $90,000 in Cypress

Bioscience and placed $8200 in a commodities account, but did not protect LaMie's principal or make any other investments. Nor did he obtain health insurance for her as he promised. When LaMie tried to obtain financial statements from McGowan to check on the status of her investments, he promised to send them but never did. The information he did provide was misleading and uninformative.

LaMie became increasingly suspicious as McGowan continued to evade her questions and requests for reports on the status of her investments. After consulting several friends regarding her problems with McGowan, she contacted the FBI in April 1998. The FBI directed her to call McGowan and record her conversations with him. FBI agents scripted questions for LaMie to ask and supplied her with blank tapes and recording equipment. Between April and July of 1998, LaMie recorded nineteen telephone calls with McGowan. During those calls, McGowan lied repeatedly about the status of LaMie's investments. He told her that her money had been invested in a number of ventures including Cypress Bioscience, Maximum Video, Navarre, Chicago Capital Holdings, and a Ramada Inn. He also told her a small amount of her money was in a commodities account, and in perhaps his most creative lie, he told her some of her money was invested in a new production of the musical "Annie." Although McGowan had placed some of LaMie's money in Cypress Bioscience, the investment was not in the amount he promised. Everything else, except for the commodities account, was a pure fabrication, as he admitted at trial. McGowan

also lied when he told LaMie that he was keeping her principal safe and that her investments were generating interest income. He lied when she asked him to liquidate her investments and return her money, and he lied about obtaining health insurance for her.

All of the testimony from LaMie came into the trial through Federal Rule of Criminal Procedure 15(a) video-taped depositions that were recorded because of LaMie's precarious health. LaMie resided in South Carolina at the time of the trial, which was held in Chicago. LaMie's doctors believed that both travel and testifying at trial presented great risks to her health. The district court found that she was unavailable for trial because of her health problems, and her videotaped deposition testimony was admitted over McGowan's objections. A jury found McGowan guilty of eighteen counts of wire fraud based on the misrepresentations he made during phone calls spanning from April 13, 1998 to June 29, 1998. The jury also found McGowan guilty of one count of investment advisor fraud. McGowan appeals.

## II.

On appeal, McGowan contends that the admission of LaMie's videotaped depositions violated Federal Rule of Evidence 804(a)(4) and his constitutional rights under the Confrontation Clause. He also argues that the court erred when it denied his motion to dismiss the indictment on statute-of-limitations grounds. He maintains that his crimes were complete more than five years

prior to the filing of the indictment, and that 18 U.S.C. §3282 requires that prosecutions for wire fraud be brought within five years of the offense.

## A.

The grand jury returned the indictment against McGowan on April 3, 2003. In March 2004, because LaMie suffered from poor health, the government moved to preserve her testimony pursuant to Federal Rule of Criminal Procedure 15(a). That rule provides:

> A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice. If the court orders the deposition to be taken, it may also require the deponent to produce at the deposition any designated material that is not privileged, including any book, paper, document, record, recording, or data.

Fed. R. Crim. P. 15(a). In support of the motion, the government submitted a letter from LaMie's physician, Dr. George Sandoz, describing her medical conditions. Dr. Sandoz, a neurologist and opthamologist, had been treating LaMie since 2001. According to Dr. Sandoz, LaMie was "almost bedridden," required oxygen twenty-four hours a day, and suffered from severe diabetes, diabetic neuropathy and biliary cirrhosis, among other things. LaMie took long-acting narcotics to control her pain, according to Dr. Sandoz. He opined that it would not be safe for LaMie to travel because of her

medical conditions. After a hearing, the court granted the government's motion.

LaMie was deposed on May 6, 7, 26, and 27, 2004, in South Carolina. McGowan and his lawyer were present at the videotaped depositions and McGowan's lawyer cross-examined LaMie extensively. At a June 9, 2004 status call, the parties discussed LaMie's availability for trial. McGowan's lawyer intended to challenge any suggestion that LaMie was unavailable for trial. During the depositions, he learned that LaMie owned a car and had recently renewed her driver's license. Based on this and other information from the depositions, he believed that prior representations about LaMie's health were exaggerated. He told the court he wished to have another physician review Dr. Sandoz's assessment of LaMie. The government maintained that LaMie could not travel to Chicago to testify because of her extensive health-related limitations. The government also clarified that LaMie had renewed her driver's license by mail and had driven the car only once in the past year, and only a very short distance. The court ordered briefing on the issue.

Along with its brief, the government submitted two affidavits from LaMie's physicians, one from Dr. Sandoz and one from Dr. Charles Busse. Dr. Sandoz again asserted that several chronic health conditions made it medically unsafe for LaMie to travel or to testify at a trial. Dr. Sandoz described LaMie's severe diabetes and opined that stress and changes in schedule could cause serious problems with her insulin treatment, and that she

could lose consciousness or even lapse into a coma as a result. Her diabetic neuropathy caused her constant pain that could be exacerbated by stress or physical activity. A disease called diffuse lipomatosis affected her lungs and required her to use oxygen all day every day, a condition that could also be worsened by stress or by the physical exertion required in travel. LaMie also had chronic liver problems, according to Dr. Sandoz, that could progress to the point of a life-threatening illness if she experienced increased emotional or physical stress. Dr. Sandoz stressed that LaMie's conditions were chronic, and that there was no reasonable likelihood that her condition would improve to a degree that would render travel safe.

Dr. Busse, a general practitioner who treated LaMie and had examined her two months prior to signing his affidavit, also characterized LaMie's conditions as chronic. According to Dr. Busse, LaMie suffered from diabetes, hypothyroidism, chronic obstructive pulmonary disease, cirrhosis of the liver and clinical depression. He stated that LaMie had also been diagnosed as suffering from multiple sclerosis but conceded that he had not treated her for that condition and could not assess whether that additional condition would affect her ability to travel. Given the conditions for which he did treat LaMie, Dr. Busse believed she could travel to Chicago with appropriate accommodations. He declined to express an opinion on whether those arrangements were practicable. However, he also asserted that courtroom testimony would likely aggravate her chronic medical conditions. The government also submitted portions of LaMie's

deposition testimony describing her multiple health issues including allergies, asthma, lung failure, heart failure, cirrhosis of the liver, multiple sclerosis, a blocked heart valve, diabetes and other conditions.

In response to the government's submission, McGowan conceded that LaMie was "unavailable" as that term is used in Federal Rule of Evidence 804(b)(1). Federal Rule of Evidence 804(a) states that a person who "is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity" is unavailable as a witness. Rule 804(b)(1) provides that certain out-of-court statements are not excluded by the hearsay rule if the declarant is "unavailable as a witness." As applicable here, Rule 804(b) states that "[t]estimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" is not excluded by the hearsay rule if the declarant is unavailable as a witness. But having conceded LaMie's unavailability, McGowan argued that the use of LaMie's deposition at his trial would violate his Sixth Amendment right to confront a witness against him because he had not had an opportunity to question LaMie regarding additional documents produced by the government. McGowan also complained that he was still waiting for the government to produce further documents from the FBI documenting the agency's directions to LaMie

in carrying out the recorded phone calls. McGowan acknowledged that the confrontation problems could be cured by further depositions. On August 5, 2004, the court granted the government's motion to admit LaMie's deposition at trial and denied McGowan's motion to take a further deposition of LaMie.

In December 2004, McGowan renewed his objection to the court's unavailability ruling. LaMie had taken a four-hour interstate car trip with friends, and McGowan argued again that LaMie's health problems had been exaggerated. The court held an evidentiary hearing where one of the friends who accompanied LaMie on the trip testified. The court found that testimony consistent with the declarations of Drs. Sandoz and Busse. The court then allowed McGowan to depose Drs. Sandoz and Busse, but did not grant McGowan's request for an independent medical examination of LaMie. Dr. Sandoz testified that LaMie's health had deteriorated in the last year, that she was not capable of traveling by plane to Chicago, and that minimal changes in her routine could have "devastating effects" on her condition. On June 7, 2005, the court again found LaMie unavailable for trial, but invited McGowan to move for an additional deposition of LaMie.

After the government produced additional records, the court allowed a December 5, 2005 deposition of LaMie. On October 16, 2006, with trial approaching, McGowan moved for a current determination of LaMie's availability for trial, and renewed a previously filed motion to suppress LaMie's deposition testimony. On

November 22, 2006, the court ordered a current report on LaMie's health, noting that in order to use LaMie's deposition in lieu of her personal appearance, the court must determine that the use of the deposition was still medically necessary. In response to McGowan's motion to suppress, the court allowed yet another deposition of LaMie. The deposition took place on December 18, 2006, and on January 3, 2007, the government submitted a report on LaMie's current health status. That report included a December 11, 2006 letter from Dr. Sandoz opining that LaMie's condition had only deteriorated since his last report and that any trip would be detrimental to her health.

On January 8, 2007, the first day of trial, the parties again discussed LaMie's unavailability. Noting that Dr. Sandoz had originally characterized most of LaMie's medical conditions as chronic with no reasonable likelihood that they would improve, the court found that the most recent letter from Dr. Sandoz indicated that LaMie had not improved since the July 2004 report. The court concluded again that LaMie was unavailable for trial:

> It is clear from Dr. Sandoz' recent letter that he regards Ms. LaMie as not having improved at all from the time of his July 2004 report. His opinion is the same. There is no surprise about it. . . . If I was right in 2005, I'm still right. I'm satisfied with that. And I say that knowing that there will be surgical attention paid to my ruling on appeal should an appeal be necessary. But I see no alternative. I think that the alternative would be cruel to this woman

to require her to come here in light of this danger to her health. And I'm not talking about discomfort, I'm not talking about inconvenience; I'm talking about the risk of serious damage to her health that is clearly reflected in this doctor's analysis.

Tr. at 19, January 8, 2007. The court therefore allowed the government to use LaMie's videotaped deposition at trial.

McGowan objected to the use of the depositions throughout the trial, contesting the finding of unavailability and also arguing that the use of the videotaped depositions violated his Sixth Amendment confrontation rights. The court rejected those claims each time. On one occasion, the court noted that "the jury is just as able to evaluate [LaMie's] demeanor from this videotape as they would be if she were present live in the courtroom giving this same testimony." Tr. at 810. *See also* Tr. at 811 (where the court remarked, "I don't think the jury would have any better view of her behavior while testifying if she were doing this same thing here in open court that she's doing on the videotape."). McGowan's attorney requested a mistrial later in the proceedings when he believed his client was prejudiced by technical difficulties with the videotapes. The court responded to his objections thoroughly and thoughtfully:

This is a very attentive jury. They are taking notes, they're reading these transcripts along with the tapes, they're paying close attention to the videotape. I've never seen a jury that was more attentive. . . . There isn't a single juror here, and I have been looking at all of them, who is anything other than completely

absorbed in what is being seen and heard in this courtroom. They are taking these glitches with the same good humor the rest of us are, and they're intelligent enough to realize that there is a great difference between the technical difficulties attending the playing of the video and the substance and the merits of the testimony that's being portrayed on the video. . . . I am pleased and in fact a little bit surprised at how good the video is in terms of giving one a real feel for Ms. LaMie. It's almost—not quite, I agree—but it's almost like having her here in the courtroom. I mean, she's just as life-like as she can be. . . . [T]he jury is getting substantially the same look and feel for her as they would if she were here in person testifying in the courtroom.

Tr. at 968-69. The court remarked that the technical difficulties were minimal albeit annoying, but did not undermine the defense's cross-examination of LaMie. The court therefore denied the motion for a mistrial.

On a third objection during trial, the court found again that the videotaped depositions provided an adequate substitute for LaMie's live testimony:

I've watched very carefully, and I've listened very carefully, and I've come to certain conclusions, and I've given you some of them. I think that her presence here in person would have been essentially no different than having her present virtually life-size on that tape recorder. I don't know what would have been shown that wasn't shown on the tape. You can see every facial expression, you can see her eyes[.] . . .

What more would have been gained by having her hobble in here and get up on the witness stand and do the same thing? I frankly don't see anything that would have been gained. The video deposition was as good as her physical presence in the courtroom, in my opinion[.]

Tr. at 1590. The court concluded that "the defendant was not prejudiced by use of the deposition." Tr. at 1590.

On appeal, McGowan argues that the district court violated Federal Rule of Evidence 804(a)(4) and the Confrontation Clause in declaring LaMie "unavailable" for trial, admitting her deposition testimony into evidence, denying his requests for an independent medical examination of LaMie, and denying a request for an evidentiary hearing on the question of LaMie's unavailability at the time of trial. We review a district court's decision to admit deposition testimony based on unavailability for abuse of discretion. *United States v. Donaldson*, 978 F.2d 381, 392 (7th Cir. 1992). Interpretation of the Confrontation Clause is a legal question that we review *de novo*. *United States v. Van Sach*, 458 F.3d 694, 701 (7th Cir. 2006); *United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006). When testimonial evidence is at issue, the Confrontation Clause of the Sixth Amendment requires that the government demonstrate that the witness is unavailable for trial and that the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

We begin with the timeliness and soundness of the district court's determination that LaMie was unavailable

to testify due to "then existing physical or mental illness or infirmity." Fed. Evid. 804(a)(4). The government bears the burden of demonstrating that its witness is unavailable to testify at trial. *Donaldson*, 978 F.2d at 392; *Burns v. Clusen*, 798 F.2d 931, 936-37 (7th Cir. 1986). McGowan first complains that the district court relied on a finding of unavailability made in 2005 to hold that LaMie was unavailable for trial on January 8, 2007. On the morning that the trial was scheduled to begin, McGowan requested an evidentiary hearing based on what he characterized as new evidence regarding LaMie's medical condition. Citing observations of LaMie at her December 18, 2006 deposition, the much earlier letter from Dr. Busse, and the out-of-state car trip that LaMie took in 2004, McGowan claimed that LaMie's condition had improved to such an extent that she was available for trial. According to McGowan's counsel, LaMie was able to walk into her attorney's office for the December 18 deposition and was even able to scale nine steps to do so. Additionally, counsel remarked that LaMie no longer required oxygen and was in fact smoking during breaks in the deposition. The government confirmed that LaMie smoked during breaks, but argued that LaMie entered the building with great difficulty and with assistance. Relying on the *Burns* case, McGowan argued that a new evidentiary hearing was required to demonstrate that LaMie remained unavailable to testify. The court, as we noted above, had already ordered the government to procure another report from Dr. Sandoz regarding LaMie's current condition. Dr. Sandoz's resultant letter was signed on December 11, 2006, approximately four

weeks prior to the beginning of the trial and one week prior to the deposition. Dr. Sandoz had most recently examined LaMie on October 31, 2006, approximately two months prior to the start of the trial. As we noted above, Dr. Sandoz reaffirmed his earlier diagnoses of LaMie's multiple chronic conditions, and opined that she was unable to take any kind of trip, and had only deteriorated since the time of his 2005 assessment of her to the court. He remarked that her mobility was so impaired that it was now almost impossible for her to visit her local doctors every few months for the treatment of her conditions.

The court did not abuse its discretion in determining that LaMie was unavailable to testify at the January 2007 trial. As the district court repeatedly noted, LaMie's medical problems were severe and *chronic*. Her doctors did not expect her condition to improve and in fact twice indicated that, as time passed, LaMie had grown even more ill and less able to endure the rigors of interstate travel and live testimony. No evidentiary hearing was needed on the day of trial because, even assuming that all of the assertions made by McGowan's counsel concerning LaMie's abilities at the December 18 deposition were true, the government still met its burden of demonstrating that LaMie was not able to travel from her home in South Carolina to Chicago and endure the rigors of testifying at trial without seriously damaging her already precarious health. The court did not rely on stale information in reaching this conclusion but rather relied on the consistency of the reports regarding LaMie's deteriorating health over time, including a report of her

condition a few months before trial. *See Donaldson*, 978 F.2d at 393. Two months before trial, LaMie was morbidly obese, suffering from brittle diabetes, peripheral neuropathy, biliary cirrhosis, lipomatosis and other severe and chronic conditions. By all accounts, her mobility was severely limited. Her many problems were not expected to improve in a few months' time. *See United States v. Campbell*, 845 F.2d 1374, 1377-78 (6th Cir. 1988) (court did not abuse its discretion in finding without a hearing that an elderly witness was unavailable to testify when the court had found two weeks earlier that exceptional circumstances justified taking the witness's deposition; "it was highly unlikely that an elderly invalid would undergo a miraculous rejuvenation during the two-week interval"). LaMie's ability to travel locally to her lawyer's office for a deposition did not change the analysis of her ability to travel interstate and endure courtroom testimony. There was nothing to be gained by delaying the trial to hold an additional evidentiary hearing on an issue over which there was no serious dispute. The court had already conducted an evidentiary hearing into the 2004 out-of-state car trip and there was no new information to examine regarding that trip. McGowan's lawyer had been allowed an opportunity earlier to cross-examine Dr. Sandoz, and his opinion had not changed. In short, the district court's January 8, 2007 assessment of LaMie, based on the 2005 assessment and supplemented by Dr. Sandoz's December 11, 2006 letter, was timely and sound given the severe, chronic and deteriorating nature of the medical problems from which LaMie suffered.

McGowan's reliance on *Burns* is misplaced. The witness in that case was deemed unavailable to testify because of mental illness. At a hearing on the issue, the witness's doctor referred to the applicable disorder as both acute schizophreniform disorder and schizophrenia, conditions with markedly different prognoses. As we observed on appeal, the former is an acute condition expected to last more than two weeks and less than six months while the latter could last considerably longer. The witness had been admitted to a hospital psychiatric ward in September 1980 in a "catatonic stupor with hallucinations and delusions." *Burns*, 798 F.2d at 938. The trial court found in January 1981 that the witness suffered from acute schizophreniform disorder. By the time of the March 1981 trial, a different judge had been assigned to hear the case. That judge simply adopted the earlier finding and determined that the witness remained unavailable, even though six months had passed since the initial diagnosis and the illness was not expected to last more than six months. Moreover, new information had become available regarding the witness's mental state but the trial court made no up-to-date findings before concluding the witness remained unavailable. *Burns*, 798 F.2d at 938-39.

We noted in *Burns* that in determining unavailability of a witness, the court must consider both the severity and the duration of the illness. 798 F.2d at 937. "The duration of the illness need only be in probability long enough so that, with proper regard to the importance of the testimony, the trial cannot be postponed." *Id*. We also indicated in *Burns* the importance of making a final

determination regarding witness availability based on up-to-date evidence about the witness's physical or mental condition at or near the time of trial. 798 F.2d at 939. If the witness's condition is temporary or of a short-term nature, we remarked that the court should consider whether to grant a continuance to allow the witness to testify. *Id*.

Unlike the witness in *Burns*, LaMie's illnesses are both severe and chronic. Her doctors' opinions never changed: she was seriously ill when the case began and her condition only deteriorated over time. The doctors advised and the court found that the stress of travel and testifying could seriously worsen her condition. Unlike the diagnosis of a temporary mental illness, LaMie's illnesses were chronic, unlikely to change over time except to worsen, and in fact did worsen over the time that passed between the indictment and trial. In this context, the court's finding of LaMie's unavailability was timely, sound, and well within the court's discretion.

Nor was McGowan's Sixth Amendment right to confront the witnesses against him compromised by the procedure employed by the district court. We have already concluded that the court did not err in finding LaMie unavailable for trial. McGowan could not seriously challenge the other part of the analysis, whether he had an adequate opportunity for cross-examination. *Crawford*, 541 U.S. at 68. McGowan was able to fully cross-examine LaMie on several different occasions, during depositions to preserve her core testimony and during later depositions to address issues raised when addi-

tional documents were produced to the defense. Moreover, the district court noted several times that the videotapes allowed the jury to fully experience LaMie's testimony, to view her demeanor, to hear her voice and to determine her credibility. We have already held that there is no Confrontation Clause violation when admitting fully cross-examined testimony preserved by a properly conducted Rule 15 deposition, and that this holding had not changed after *Crawford*. *United States v. Cannon*, 539 F.3d 601, 604 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 2013 (2009); *Donaldson*, 978 F.2d at 392-93. We thus see no error in the court's decision to allow the use of the videotapes nor in the court's conclusion that McGowan was not prejudiced by the use of the videotapes. *See United States v. Presbitero*, 569 F.3d 691, 703-04 (7th Cir. 2009) (errors arising under the Confrontation Clause are subject to harmless error analysis).[1]

---

[1] The government argued that, if we found that the district court erred in admitting the tapes, the error was harmless considering the evidence against McGowan. In assessing the strength of the case against McGowan, the government asked us to consider the videotapes themselves. We are hard-pressed to understand this circular argument. In determining whether evidence admitted in error is harmless, we consider the strength of the *remaining* evidence against the defendant, among other things. "An error is harmless when the reviewing court is convinced that the jury would have convicted *even absent the error*." *United States v. Conner*, 583 F.3d 1011, 1025 (7th Cir. 2009) (emphasis added); *United States v. Ozuna*, 561 F.3d 728, (7th Cir. 2009) (same). The government contends that a videotaped

(continued...)

**B.**

McGowan next argues that the district court erred when it denied his motion to dismiss the indictment under 18 U.S.C. § 3282. McGowan contends that the indictment was returned more than five years after the completion of the crime, exceeding the five-year limitations period. We review *de novo* the district court's denial of a motion to dismiss based on statute-of-limitations grounds, deferring to the district court's factual determinations. *United States v. Useni*, 516 F.3d 634, 655 (7th Cir. 2008); *United States v. Are*, 498 F.3d 460, 464 (7th Cir. 2007); *United States v. Barnes*, 230 F.3d 311, 314 (7th Cir. 2000). The statute of limitations for wire fraud is five years. *United States v. Tadros*, 310 F.3d 999, 1006 (7th Cir. 2002).

The government filed the indictment on April 3, 2003, charging McGowan with eighteen counts of wire fraud and one count of investment advisor fraud. The indictment alleged that McGowan's scheme to defraud LaMie ran from approximately September 1997 through July 1998. In

---

[1] (...continued)

deposition should be exempt from this well-worn rule because of its unique value. We see no reason to change this well-established rule to create an exception for videotaped depositions. If they were admitted in error, they may not be considered in assessing the strength of the case against the defendant. *See also Neder v. United States*, 527 U.S. 1, 18 (1999) (the harmless-error inquiry must be essentially: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?").

furtherance of that scheme, the indictment alleged that McGowan made eighteen telephone calls between April 13, 1998 and June 29, 1998 to LaMie, all within five years of the filing of the indictment. Those eighteen calls serve as the basis for the eighteen counts of wire fraud. McGowan argues that the indictment came too late because LaMie contacted the FBI in March 1998, after she had invested her money with him. All of the phone calls took place after the government knew about the fraud and after McGowan had obtained LaMie's money. McGowan maintains that the calls could not have been made in furtherance of a scheme about which the authorities were already aware. According to McGowan, because LaMie was already suspicious and had already contacted law enforcement, nothing he said in those calls could have lulled LaMie into a false sense of security regarding her investments, and thus could not have furthered a scheme to defraud LaMie.

In order to prove its wire fraud case against McGowan, the government was obliged to prove McGowan's participation in a scheme to defraud, his intent to defraud, and his use of the wires in furtherance of the fraudulent scheme. *United States v. Roberts*, 534 F.3d 560, 569 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 1028 (2009); *Tadros*, 310 F.3d at 1006. Wire communications that lull a victim into a false sense of security after the victim's money had already been obtained, or that assist the defendant in avoiding detection may be sufficient to further a scheme. *United States v. O'Connor*, 874 F.2d 483, 486-87 (7th Cir. 1989). Both the Supreme Court and this circuit have recognized "that calls made after the time that goods

have been fraudulently obtained can nevertheless further the fraudulent scheme by making detection or apprehension less likely." *O'Connor*, 874 F.2d at 486 (citing *United States v. Lane*, 474 U.S. 438, 451-52 (1986); *United States v. Sampson*, 371 U.S. 75, 81 (1962); *United States v. Eckhardt*, 843 F.2d 989, 994 (7th Cir. 1988)). The Supreme Court has also rejected the contention that a mailing that actually contributes to uncovering the fraudulent scheme cannot supply the mailing element of the mail fraud offense. *Schmuck v. United States*, 489 U.S. 705, 715 (1989). Nor does it matter whether the scheme succeeds. *Tadros*, 310 F.3d at 1006. Rather, the relevant question is whether the wire communication "is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the [wire communication] later, through hindsight, may prove to have been counter-productive and return to haunt the perpetrator of the fraud." *Schmuck*, 489 U.S. at 715.

Under those standards, the eighteen calls, which were designed by McGowan to lull LaMie into a false sense of security, were sufficient to meet the element of fur-thering the scheme. The lulling was part of McGowan's investment advisor fraud, and so the eighteen calls bring that count well within the period of limitations. Because those calls all came within five years of the filing of the indictment, the court was correct to reject McGowan's motion to dismiss on statute of limitation grounds.

AFFIRMED.