NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted June 23, 2010[*]
Decided June 23, 2010

**Before**

JOHN L. COFFEY, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

No. 08-2556

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     *Plaintiff-Appellee,* <br><br>     *v.* <br><br> ROGER WOLF, <br>     *Defendant-Appellant.* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. <br><br> No. 03 CR 532-2 <br><br> David H. Coar, <br> *Judge.* |

**O R D E R**

A federal jury found Roger Wolf guilty of eight counts of wire fraud, *see* 18 U.S.C. § 1343, for his role in scheming to defraud the bank financing his business. The district court sentenced him to a total of 48 months' imprisonment. Proceeding pro se on appeal, Wolf alludes to several arguments but raises only one—that the trial evidence is insufficient to sustain his convictions. We affirm the judgment.

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeals are submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

Wolf was president and sole owner of Illinois Vehicle Insurance Agency, a company that, with the aid of wholly owned subsidiary Illinois Vehicle Premium Finance ("IVPF"), sold automobile insurance and other insurance products to high-risk drivers in Illinois. Typically, a customer would purchase a term policy of six or twelve months, paying about 20 percent of the cost of the policy upfront. IVPF would then finance the remainder of the cost of the policy, purchase it on behalf of the customer, and charge the customer monthly installments that included interest and other fees.

IVPF sought new funding in 1995 and entered into a collateralization agreement with a Texas bank now owned by JPMorgan Chase Bank. Under that agreement and a 1997 renewal, Chase eventually committed to making up to $55 million available to IVPF. Each month IVPF provided Chase with reports detailing policies obtained for its customers and requested funds to finance the purchase of those policies. Chase would forward the funds, and in return IVPF would assign the future payments due on the financed policies to Chase. The terms of the agreement called for Chase to earn a return of between 8 and 12 percent on its investment. IVPF made money primarily by charging fees to collect and process the monthly payments from its customers.

In order to ensure the performance of the portfolio, Chase set specific guidelines for the policies it would finance. The agreement between IVPF and Chase characterized policies meeting the bank's parameters as "eligible" and all other policies as "ineligible." The agreement made clear that IVPF would be responsible for reimbursing Chase for any ineligible policy inadvertently purchased with Chase's money. The agreement also required IVPF to maintain a segregated "Deposit Account" exclusively for payments received on policies financed by Chase. These payments were to be held in the Deposit Account and sent to Chase by the next business day after receipt. The agreement also required IVPF to update Chase daily on monies deposited into the Deposit Account and to send a monthly servicer's report identifying all open accounts and all new policies originated by IVPF for the month. This latter report was the primary method by which Chase tracked the receivables securing its extension of credit to IVPF.

All was well until November 1999 when Chase conducted a routine review of IVPF's financial statements. The bank detected a shortfall of about $9 million between the amount outstanding on Chase's loan to IVPF and the company's accounts receivable. Chase immediately notified IVPF that it would fund no more policies until the shortfall was explained and the amounts were reconciled. Chase also demanded an audit of the accounts receivable, as permitted under the terms of the agreement. IVPF ignored the audit request. Payments on policies previously financed by Chase continued, however, and IVPF remained obligated to forward those payments to Chase.

IVPF was still using the Deposit Account and forwarding money from that account to Chase in October 2000 when consultants hired by the bank visited IVPF's offices and compared its bank statements with the servicer's reports submitted to Chase. The consultants discovered that Jerome Januszewski, IVIA's controller and chief financial officer, had wired about $6.2 million out of the Deposit Account in roughly 50 transactions from December 1999 through September 2000 (the indictment period). Chase first sought civil relief and later alerted the government. After an investigation, Januszewski was charged in May 2003 with wire fraud based on the false servicing reports faxed from Illinois to Chase in Texas during the months covered by the indictment. The indictment was later superseded to add Wolf on the theory that he directed Januszewski to falsify the reports.

Januszewski, who agreed to cooperate with the government, testified at Wolf's trial that he transferred the $6.2 million from the Deposit Account into IVPF's operating accounts and concealed the transfers from Chase at Wolf's behest. According to Januszewski, the transfers permitted IVPF to continue operations after Chase cut off funding. He explained that Wolf had been trying to keep the company's other creditors at bay until he could secure new financing or sell IVPF as an ongoing business. Without these transfers, Januszewski continued, the business had only a few weeks of working capital. He also testified that Wolf instructed him at several points to stall Chase by falsifying the monthly servicer's reports. He was told to "spin 'em" or "buy time" whenever he asked Wolf how to deal with Chase's repeated requests for meetings and information regarding the shortfall or requested audit, an admonition that Januszewski understood to mean stall and continue concealing the nature of the transactions from Chase. In addition, two Chase consultants testified that Wolf admitted the scheme when he met with them in October 2000. They recounted that Wolf justified diverting funds from the Deposit Account to keep his business afloat and prevent Chase's refusal to fund new business from "choking" off his ongoing business.

Wolf's defense at trial proceeded on two bases: impeaching Januszewski's credibility and arguing that the diverted monies were never Chase's in the first place. Wolf's lawyer questioned Januszewski about inconsistent statements he gave when deposed in the civil matter between IVPF and Chase. Counsel also established that Januszewski had transferred money out of the Deposit Account before the indictment period (which Januszewski had denied on direct examination) and exercised far more day-to-day control over IVPF's finances than did Wolf. Januszewski also conceded that IVPF had long adopted the practice of depositing payments for both eligible and ineligible policies into the Deposit Account and then culling the proceeds from ineligible policies before sending the remainder to Chase. And, Januszewski admitted removing the footed pages from funding reports which would have allowed Chase to easily reconcile the often lengthy lists of policies. That way Chase could not readily tell that some of the policies it was funding were ineligible.

Wolf's trial counsel also elicited though cross-examination that the Chase consultants and the FBI case agent had not conducted a forensic analysis to confirm that the monies transferred out of the Deposit Account exceeded the amount of the ineligibles. Counsel argued that any payments from ineligible policies belonged to Wolf, not Chase, because the agreement with Chase expressly excluded ineligibles from funding. At the government's behest, however, the jury was instructed that proof of actual loss is not required to convict.

On appeal Wolf challenges the sufficiency of the evidence. To prove wire fraud under § 1343, the government needed to show that Wolf participated in a scheme to defraud, had intent to defraud, and used the wires in furtherance of the scheme. *See United States v. Radziszewski*, 474 F.3d 480, 484-85 (7th Cir. 2007); *United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001). Wolf does not dispute that the servicer's reports were false or that they were sent by facsimile from Illinois to a Chase office in Texas. He argues instead that the funds diverted from the Deposit Account belonged to IVPF and thus the government never demonstrated intent or participation in a scheme to defraud.

Wolf bases this argument on the distinction between eligible and ineligible policies. Because the agreement called for Chase to finance only eligible policies, Wolf argues, the ineligibles were funded by IVPF funds alone and the receivables for the ineligibles belonged to IVPF alone. Wolf asserts that evidence adduced at trial supports his contention that the monies diverted from the Deposit Account were not shown to exceed the receivables from these ineligible policies and that Januszewski was only taking funds from the Deposit Account that already belonged to IVPF. To further support his contention, Wolf points to Januszewski's testimony that IVPF had long commingled payments on the eligibles and ineligibles in the Deposit Account without objection. Because of this commingling, Wolf argues, the government failed to show that the money diverted was Chase's.

A conviction will stand if any rational jury could have found the elements of the charged crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009); *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008). As we have often noted, appellants challenging the sufficiency of the evidence face a "nearly insurmountable" obstacle, especially in light of the fact that we do not second-guess jurors about the credibility of witnesses or the weight of the evidence. *See United States v. Oros*, 578 F3d 703, 710 (7th Cir. 2009); *Radziszewski*, 474 F.3d at 485; *United States v. Angle*, 234 F.3d 326, 339 (7th Cir. 2000). Viewed in the light most favorable to the government, the evidence is ample.

Januszewski testified that Wolf instructed him to take the money from the Deposit Account to fund new policies and IVPF's daily operations and to conceal the transactions from Chase; he also testified that, without these transfers, IVPF would have had only a few

weeks' operating funds at the most. According to Januszewski, when Chase asked questions, Wolf repeatedly told Januszewski to "spin 'em," which Januszewski understood to mean continue deceiving Chase to buy further time. In addition, Chase's consultants testified that Wolf admitted the scheme when he met with them in October 2000. There is no evidence in the record that Wolf ever claimed during his dealings with Chase that the money transferred out of the Deposit Account belonged to IVPF. Rather, counsel raised the argument at Wolf's criminal trial and, given the evidence, the jury was entitled to view the contention as a post-hoc attempt to explain away Wolf's intended fraud.

Wolf also attempts to discredit Januszewski by pointing out that his testimony was impeached with prior inconsistent statements. But nothing Wolf points to would have precluded the jury from believing Januszewski's testimony that Wolf instructed him to deceive Chase. As was its prerogative, the jury chose to believe Januszewski despite the inconsistencies of his testimony. In any event, Januszewski's cross-examination further hurts Wolf's argument: Wolf's lawyer elicited testimony that Januszewski had concealed ineligible policies in various funding reports, which deceived Chase into funding ineligible policies. This testimony reinforced the conclusion that the money diverted was Chase's and not IVPF's because IVPF was obligated under the agreement to reimburse Chase for any inadvertently funded ineligibles.

Wolf also contends that he cannot be guilty because the government did not prove that Chase lost money during the period covered by the indictment. According to Wolf, Chase had estimated the shortfall at $9 million in November 1999 and it stood at $8.5 million at the end of the indictment period in October 2000. But the government need not have shown actual loss to establish Wolf's guilt under the indictment—evidence of Wolf's intent and participation in the scheme are sufficient to sustain Wolf's conviction. *See, e.g.*, *United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009); *United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003); *see also* Pattern Criminal Federal Jury Instructions for the Seventh Circuit (1998), p. 217 ([Wire] fraud statute "can be violated whether or not there is any [loss or damage to the victim of the crime] [or] [gain to the defendant]"). In any event, Wolf's shortfall argument misses the point: Chase's losses might have been lower had IVPF forwarded the funds to Chase rather than diverting them for its own use.

AFFIRMED.