HAMILTON, Circuit Judge,
dissenting.
I respectfully dissent. I agree with my colleagues that the district court did not abuse its discretion by allowing evidence of Vasquez’s 2002 conviction, by allowing evidence found in the search of the automobile, or by limiting the cross-examination of Agent Chupik. I also agree that the district court’s error in preventing the defendant from refreshing Agent Chupik’s recollection was harmless. However, I cannot agree that the MCC tapes were admissible or that the district court’s errors in admitting the MCC tapes were *899 harmless. I would reverse the conviction and remand for a new trial.
Marina Perez’s second visit to the witness stand in the government’s rebuttal case, to explore a phantom inconsistency and to admit erroneously the MCC tapes, caused unfair prejudice to the defendant. The jury heard evidence that the defendant’s lawyer had advised him to plead guilty and had said that if the three defendants went to trial, “everyone is going to lose.” That evidence had no genuine probative value, and it is difficult to imagine more prejudicial evidence. Even if a limiting instruction telling the jury that such damaging evidence should not be considered for the truth of the matters asserted could have been effective, which I doubt, no instruction was given. The district court admitted the rebuttal evidence as proof of the truth of the matters asserted in the taped MCC telephone calls, which my colleagues and I all agree was an error.
The whole episode made for a fairly dramatic conclusion for the trial. The defense case concluded on a Thursday, and the trial recessed for the weekend. On Sunday, the government filed an emergency motion for a continuance to prepare a rebuttal case using the MCC tapes of Marina Perez’s conversations with her husband. On Monday, the court allowed the delay and sent the jury home. Mrs. Perez was called to testify again on Tuesday. In her testimony, she admitted the key legitimate point that the government was entitled to make: that she expected or at least hoped that Vasquez’s lawyer could help her husband receive a lighter sentence. But the government’s rebuttal did not stop there. After Mrs. Perez testified, the government played the tapes through another witness. On Wednesday, after further drama, the case was given to the jury.[1] Mrs. Perez’s testimony and the government’s attempted impeachment figured prominently in the government’s closing argument to the jury. Then, after the jury had heard that Vasquez’s attorney had told him to take a plea and that he was going to lose at trial, that same attorney rose, with his credibility destroyed, to give closing argument on Vasquez’s behalf.
One theory for questioning Mrs. Perez about the MCC tapes and then admitting the tapes was that they were prior statements by Mrs. Perez that were inconsistent with her trial testimony for the defense. But inconsistent with what? Mrs. Perez testified that Vasquez drove to the site of the drug meeting because she asked him to pick up her husband with the Perez’s car. Nothing in the MCC tapes is inconsistent with that testimony. The government’s theory was that Mrs. Perez’s belief that Vasquez would be convicted was inconsistent with her testimony that it was her fault that Vasquez happened upon the scene of the transaction. See Gov’t Br. 18. The theory seems to be that if Mrs. Perez’s trial testimony were honest, she necessarily would have believed that as long as she testified truthfully, the jury would unerringly find Vasquez not guilty. Because she was very worried that Vasquez would be convicted, goes the theory, the jury should conclude that she lied in her trial testimony.
That theory of the supposed inconsistency makes sense only if we assume that, if Mrs. Perez was telling the truth, she also *900 must have had an extraordinary and even naive confidence in the infallibility of juries in telling the difference between true and false testimony. Any citizen who has followed recent news of exonerations of innocent but convicted defendants would be entitled to worry. One can be a great believer in the wisdom of juries, as I am, without assuming they are infallible. Let’s assume for purposes of argument that Mrs. Perez’s testimony about asking Vasquez to drive the Perez’s car to pick up her husband was true. Even so, anyone as familiar as she was with the evidence against both her husband and Vasquez— who were then both in the federal lock-up under federal indictment — could reasonably worry that she might not be believed. If a witness’s expression of the view that a trial might come out the wrong way can be treated as inconsistent with the witness’s testimony for the “right” result, we will see more cases with attempted impeachment like this.
I recognize that a prior statement need not be “diametrically opposed” to a witness’s testimony to be inconsistent, but genuine inconsistency is still necessary. See United States v. Hale, 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); United States v. Jones, 808 F.2d 561, 568 (7th Cir.1986); accord, United States v. Cody, 114 F.3d 772, 776-77 (8th Cir.1997). The supposed inconsistency here was nonexistent. It was an abuse of discretion to admit the evidence on that theory.[2]
The government’s bias theory also does not justify admission of the MCC tapes. Evidence of a witness’s bias is always relevant, of course. See, e.g., United States v. Lindemann, 85 F.3d 1232, 1243 (7th Cir.1996). But the first problem here is that before the MCC tapes were admitted, Mrs. Perez had already admitted the asserted bias: she hoped that Vasquez’s lawyer would help her husband receive a lower sentence. There was no need for further extrinsic evidence of the point, especially where that extrinsic evidence posed all the problems that the MCC tapes did here. In light of Mrs. Perez’s candid (if perhaps naive) admission, the tapes provided no or little additional probative value, but caused substantial unfair prejudice to defendant Vasquez.
Neither theory of admission — prior inconsistent statements or evidence of bias— supported admission of the MCC tapes at all. My colleagues and I agree at least, however, that the district court erred in admitting the MCC tapes for the truth of the matters asserted by the speakers. Bias is not an exception to the hearsay rule, and even genuinely inconsistent statements are not admissible for the truth of the matters asserted. In this case, the tapes included hearsay, double hearsay, and even triple hearsay. In the most extraordinary and prejudicial example, the jury heard Joel Perez tell Marina Perez that Vasquez had told him that Vasquez’s lawyer had told Vasquez that he should plead guilty:
Marina: So what’d Beau [Vasquez’s lawyer] tell him [Vasquez]? What did Beau tell him?
Joel: A blind plea would be good, then he can guarantee this and that. You know what I mean? Just certain *901 things, you know? I got to explain to you.
Marina: He’s telling him about a blind plea also?
Joel: Yeah, he is. I gotta explain to you. You know what I mean. He says, if you want, have his wife talk to me, this or that. I have to explain to you tomorrow.
Supp.App. 13.[3] The jury also heard Marina Perez tell her husband that Vasquez’s lawyer (who was his lead trial attorney) had told her that if the three defendants went to trial, “everybody is going to lose.” SuppApp. 11. The government highlighted that comment in its questioning of Mrs. Perez. Tr. 528-29. The erroneous admission of this highly prejudicial hearsay and triple hearsay for the truth of the matters asserted should require a new trial.
My colleagues conclude, however, that the erroneous treatment of the MCC tapes evidence was harmless because the government had so much other evidence against Vasquez. I respectfully disagree. The issue is whether the reviewing court is “convinced that the jury would have convicted even absent the error.” United States v. Simmons, 599 F.3d 777, 780 (7th Cir.2010) (holding that arguable errors in admitting evidence were harmless in light of defendant’s own admissions about his involvement in crime). The standard calls upon an appellate court not to “become in effect a second jury,” see Neder v. United States, 527 U.S. 1, 19, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), but to determine “whether it appears ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.’ ” Id. at 15, 119 S.Ct. 1827, quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Accord, e.g., United States v. McGowan, 590 F.3d 446, 456 n. 1 (7th Cir.2009); United States v. Williams, 493 F.3d 763, 766 (7th Cir.2007).
The standard is not easy to satisfy, and four factors here lead me to conclude this error was not harmless: the modest strength of the rest of the government’s case against Vasquez, the prejudicial character of the evidence that was admitted erroneously, the fact that the jury acquitted Vasquez of one of two charges, and the importance that the government itself attributed to its flawed rebuttal evidence.
Looking first at the strength of the rest of the case, we can all agree that the government had a solid case against both Perez and Cruz. Both were recorded making arrangements for the cocaine purchase, and both showed up at the agreed time and place. The case against Vasquez was not as clear. Vasquez was not recorded at all. He was not even mentioned in any of the recorded calls. The agents, the confidential informant, and even Cruz were expecting only a single customer to show up for the meeting. They knew nothing about Vasquez until they saw him arrive in the Perez’s car at the nearby Denny’s parking lot, from where he could see Perez and Cruz. He never got out of the car, and the agents did not hear him talk with anyone.
On the other hand, of course, Vasquez arrived at the scene of a planned drug meeting driving a car carrying $23,000 in a hidden compartment. He fled in the car, dramatically and dangerously, as the *902 agents tried to make the arrests. He had previously been convicted of a drug deal with Perez using a car with a similar hidden compartment. And Cruz testified that he heard Vasquez tell Perez on the telephone: “tell him we got the money here.”
Let’s put aside the flight evidence for a moment and focus on the other evidence. Marina Perez’s testimony provided an innocent explanation for Vasquez’s presence on the scene in the car with the hidden money. She said she planned to pick up her husband but had an argument with him. She asked Vasquez to pick him up and to take the Perez’s car because his own was parked in by that car. The credibility of her testimony is at least debatable. And Cruz, the co-defendant who set up the meeting with the informant, testified that Perez was not even supposed to bring any money to the meeting, Tr. 237-38, which is at least consistent with her testimony.
Cruz’s testimony about Vasquez’s statement, “tell him we got the money here,” was important. Apart from the flight evidence, it was the strongest evidence against Vasquez, and it was actually inconsistent with Marina Perez’s testimony. My colleagues treat the statement as an undisputed fact, but that is a mistake when we are evaluating whether an error was harmless. The credibility of that key bit of testimony was subject to strong attacks, far stronger than the government’s attacks on Mrs. Perez’s testimony. Cruz was a cooperating defendant with powerful incentives to help the government prove its case against Vasquez, the only one of the three who went to trial. On the witness stand, Cruz admitted having lied to the government about Vasquez and several other subjects. Tr. 250-52, 254-56, 268-72, 289. Most important, Cruz admitted that he first told the government about Vasquez’s supposed “money” comment less than one week before trial. Tr. 263-64. By that time, Cruz had already been debriefed by the government several times, all without ever mentioning the single most damaging part of his testimony against Vasquez. On this record, the jury could easily have treated the “money” comment as a late and false invention by Cruz. The Rule 404(b) evidence — the pri- or conviction — was strong evidence, but it remained 404(b) evidence that could not make the case by itself.
Without the flight evidence and the MCC tapes erroneously admitted for their truth, then, the government had evidence that was legally sufficient to convict Vasquez, but the case was far from a slam-dunk. The dramatic evidence of the dangerous flight strengthened the case substantially and makes it easier for my colleagues to describe the district court’s error as harmless. But the flight evidence cannot carry that much weight, in my view. The Supreme Court and we have repeatedly cautioned against too much reliance on flight as evidence of guilt for the crime charged because there are so many links in the chain of inferences:
We have long adhered to the Supreme Court’s cautionary language urging courts to be wary of the probative value of flight evidence. See Wong Sun v. United States, 371 U.S. 471, 483 n. 10 [83 S.Ct. 407, 9 L.Ed.2d 441] (1963) (“[W]e have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime.”). While we allow evidence of flight to be presented, courts must engage in careful deliberation when considering its admission. Determination of the probative value of flight as evidence of a defendant’s guilt depends on the degree of confidence with which four inferences can be *903 drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. See United States v. Levine, 5 F.3d 1100, 1107 (7th Cir.1993); see also United States v. Jackson, 572 F.2d 636, 639 (7th Cir.1978) (adopting this analysis as set forth in United States v. Myers, 550 F.2d 1036, 1049 (5th Cir.1977)).
United States v. Robinson, 161 F.3d 463, 469 (7th Cir.1998). If we follow that cautious approach to flight evidence, we should not rely on it to save the jury’s verdict from the error we all agree was made in admitting the highly prejudicial evidence from the MCC tapes.
We must also consider the prejudicial effect of the improper evidence. The evidence from the MCC tapes, admitted here erroneously for their truth and with no true probative value, was just about as prejudicial as one could expect to encounter in a trial. The jury heard that Vasquez’s lawyer — the man who would soon make a closing argument asking them to find reasonable doubt in the government’s case — had told Vasquez that he should plead guilty and had said that if he and his codefendants went to trial, “everyone is going to lose.” A juror who heard and believed that evidence would surely discount anything she heard from that lawyer. In terms of prejudice, these harpoons are comparable to evidence of a defendant’s own withdrawn guilty plea. Such a plea is virtually never admissible because of its powerful force. See Fed. R.Evid. 410(1); Kercheval v. United States, 274 U.S. 220, 223-24, 47 S.Ct. 582, 71 L.Ed. 1009 (1927).
We also have strong indications from both the jury and the government itself that the erroneous admission of the MCC tapes was not harmless. Even with the prejudicial and erroneous evidence, the jury still found Vasquez not guilty on the charge of attempted possession with intent to distribute. That verdict is hard to reconcile with the jury’s conviction on the conspiracy charge, and the split verdict certainly has the whiff of a compromise verdict in a close case. Such verdicts are permissible in criminal cases, of course, but when determining whether, beyond a reasonable doubt, a conceded error was harmless, we should not ignore that strong signal that the jury viewed the case as a close one, even with the evidence of flight and the improper rebuttal evidence.
The government also showed how important it believed the improper rebuttal evidence was by its extraordinary efforts to obtain its admission. The trial seemed nearly over when the government filed its emergency Sunday motion for a continuance to enable it to prepare this rebuttal case. The events of the next several days, including especially the government’s emphasis on the improper evidence in its closing argument, showed that the government believed that Mrs. Perez had seriously weakened its case and that the improper rebuttal evidence strengthened its case considerably. My colleagues disagree with that assessment, but in applying the harmless error standard, we should give more weight to the views of the party who sought admission of the improper evidence, as shown by that party’s conduct at trial.
I am not trying to suggest that Vasquez is actually innocent or that I necessarily believe Marina Perez’s testimony about why he was in the car at the scene of the bust. Those are questions for the jury. But in light of the closeness of the case, the highly prejudicial nature of the improper evidence, the jury’s split verdict, *904 and the government’s emphasis on the improper evidence, I am not convinced beyond a reasonable doubt that the jury would have convicted Vasquez in the absence of the improper and highly prejudicial MCC tape evidence. I would vacate the judgment and order a new trial.

. The further drama included the government threatening Vasquez's lawyer with investigation and prosecution, Tr. 571, and the court holding Joel Perez in contempt of court because he refused to testify and telling him that he faced life in prison if he continued to refuse. Tr. 578-79. After that finding and threat, the government said: "I don’t know if we need Mr. Perez still or not.” Tr. 579. He did not testify.

. My colleagues also suggest that Mrs. Perez failed to disclose several meetings with Vasquez’s lawyer when she testified in the defense case. Op. at 896-97. She testified about the only meeting she was asked about. Tr. 419. The fact that she had other meetings, which she was not asked about, was not inconsistent with her testimony. A witness should not be impeached for having failed to volunteer information not sought by the questioner. In fact, in a criminal trial, volunteered information often poses a greater danger to the fairness of the trial than omissions do.

. The government argues for a different interpretation, that Joel Perez was telling Marina that Vasquez's lawyer had told Joel that Joel should enter a blind guilty plea (i.e., a plea without an agreement). In context, the better reading, and certainly a permissible interpretation available to the jury, is that both Joel’s lawyer and Vasquez's lawyer were telling their respective clients that they should enter blind guilty pleas. That explains Marina's “also,” since Joel's lawyer was advising him at the time to enter a blind plea.